**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Theodore Lawrence VAROZ,**
**Defendant-Appellant.**

No. 83–1660.

United States Court of Appeals,
Tenth Circuit.

July 20, 1984.

Winston Roberts-Hohl, Santa Fe, N.M. (James L. Brandenburg, Albuquerque, N.M., with him on briefs), for defendant-appellant.

David N. Williams, Atty., Albuquerque, N.M. (William L. Lutz, U.S. Atty., and Richard J. Smith, Asst. U.S. Atty., Albuquerque, N.M., on brief), for plaintiff-appellee.

Before McWILLIAMS, McKAY and LOGAN, Circuit Judges.

LOGAN, Circuit Judge.

Defendant Theodore Lawrence Varoz, a podiatrist, appeals from his conviction on eight counts of submitting false Medicare claims in violation of 42 U.S.C. § 1395nn(a)(1)(i). On appeal defendant challenges the sufficiency of the evidence to support each conviction. He also asserts that the trial court abused its discretion in permitting defendant to be cross-examined in two areas. Although we affirm three of the convictions, we review all the others despite the concurrent sentence doctrine because of the possible consequences of the convictions on parole eligibility and on civil litigation regarding defendant's right to practice his profession.

I

The indictment against defendant contained twenty-five counts, all of which were identical except for the date of treatment, the name of the patient, and the amount of the claim. For example, Count II charged:

"On or about the 17th of April, 1980, in the State and District of New Mexico, the defendant THEODORE LAWRENCE VAROZ did knowingly and willfully make and cause to be made false statements and representations of material fact in application for payment under the terms of the Medicare Program, Subchapter XVIII of the Social Security Act, 42 U.S.C. 1395 et seq., in that the defendant THEODORE LAWRENCE VAROZ submitted and caused to be submitted a Claim Form purporting to reflect charges in the amount of $783.15 for podiatric services and treatment rendered to patient Maria P. Hernandez, whereas in truth and fact, as the defendant then and there knew, said Claim Form was false in that the services and treatment were not rendered as described.

In violation of 42 U.S.C. 1395nn(a)(1)(i)."

The jury found defendant not guilty on thirteen counts and convicted him on eight counts: II, IX, X, XIV, XV, XIX, XXI, and XXII. The trial court declared a mistrial on the four counts on which the jury could not reach a verdict.

We agree with defendant that the indictment and instructions to the jury required the government to prove that defendant did not perform the services for which he billed the government. Whether services actually rendered were medically necessary was not an issue.

The eight counts on which defendant was convicted involved six patients. None of those patients testified at trial. The government's evidence on the issue of whether defendant had actually performed the procedures for which he submitted claims was the expert testimony of another podiatrist, Dr. Morris Haas. Dr. Haas testified based upon his examination of x-rays, claim forms, and records introduced into evidence; he did not talk to or examine any of the patients. The government also introduced evidence showing that defendant was careless in keeping records and that patients often signed blank consent forms.

Due process requires that every conviction be supported by sufficient evidence. *Jackson v. Virginia*, 443 U.S. 307, 316, 99 S.Ct. 2781, 2787, 61 L.Ed.2d 560 (1979). Evidence is sufficient to support a criminal conviction if, taken in the light most favorable to the government, the factfinder may find the defendant guilty be-

yond a reasonable doubt. *Id.* at 316, 319, 99 S.Ct. at 2787, 2789. The evidence must be substantial; it must do more than raise a mere suspicion of guilt. If the evidence is consistent with both innocence and guilt it cannot support a conviction. *United States v. Ortiz,* 445 F.2d 1100, 1103 (10th Cir.), *cert. denied,* 404 U.S. 993, 92 S.Ct. 541, 30 L.Ed.2d 545 (1971).

 An expert may give an opinion as to an ultimate issue. Fed.R.Evid. 704. The weight and credibility of expert testimony are matters for the jury. *United States v. Coleman,* 501 F.2d 342, 346 (10th Cir.1974). However, to sustain a conviction based on an expert's opinion as to an ultimate issue we must be able to find that rational minds could have found beyond a reasonable doubt that such opinion was correct. *See Nagell v. United States,* 392 F.2d 934, 937 (5th Cir.1968). The expert's testimony must be such that it "will assist the trier of fact to understand the evidence or to determine a fact in issue." Fed.R. Evid. 702. The rules contemplate that the expert will give his opinion and "his reasons therefor." *Id.* 705. Because the jury must weigh the expert's testimony, the testimony must be accompanied by presentation of the facts and premises underlying the expert's opinions and conclusions. *United States v. Brawner,* 471 F.2d 969, 994 (D.C.Cir.1972); *see also United States v. Julian,* 440 F.2d 779, 780 (9th Cir.1971) (jury may disregard psychiatrist's testimony after weighing the facts upon which he based his diagnosis); *Holm v. United States,* 325 F.2d 44, 46–47 (9th Cir.1963). With that in mind we review the evidence presented through the government's expert.

### Count II

Count II charged that defendant submitted a claim for services not actually rendered to Maria Hernandez. The government introduced a claim for an osteotomy performed on April 17, 1980, for angular correction shortening on the third and fourth metatarsal bases of Ms. Hernandez' right foot. R. II, 97–98. The prosecution introduced another claim for the same procedures performed on January 31, 1980, and an entry from Ms. Hernandez' chart for that date stating "very successful surgery" and referring to an "op report." R. II, 98–99. Dr. Haas said that he had not been able to find an operative report for the January procedure. R. II, 99. The following exchange then took place between the prosecutor and Dr. Haas:

"Q. [prosecutor] You told us in the medical chart of 'very successful surgery.' In your professional medical opinion, do you know of any reason why the procedure would have been repeated on the 17th of April, 1980?

A. [Dr. Haas] I do not.

Q. Could it have been repeated on the 17th of April if it was done as indicated on the 31st of January?

A. The word 'could,' sir, brings to mind what could, could not—Yes, it could. But I couldn't understand it. But I suppose you could go back in and cut a person the second time, but I don't know why, if it was successful."

R. II, 100.

 In essence, Dr. Haas testified that there was no medical reason to perform the procedure a second time if the procedure was successful the first time. Even ignoring Dr. Haas' failure to explain his conclusion and assuming that the prosecution proved that the first procedure was successful, Dr. Haas' testimony is insufficient to support a determination that defendant did not perform the second surgery. The indictment required the prosecution to prove that the services for which the Medicare claim was made "were not rendered as described." A defendant may not be convicted on a theory not charged in the indictment. *Eaton v. Tulsa,* 415 U.S. 697, 94 S.Ct. 1228, 39 L.Ed.2d 693 (1974). Dr. Haas' testimony is as consistent with useless surgery as with absence of surgery. Thus, the prosecution produced no evidence to support a conviction on Count II.

### Count IX

Count IX charged that defendant submitted a claim for services not actually rendered to Harold Frysinger on January 10, 1980. In regard to that count the following exchange took place between the prosecution and Dr. Haas:

"Q. [prosecutor] Doctor, I'm going to hand you three more exhibits. They will be Exhibits 9, 39 and 40 and I'll ask you, first, to look at Exhibit 9 and tell us the name of the patient for whom the surgery in that claim form was assertedly performed?

A. [Dr. Haas] Harold Frysinger.

Q. And what sort of services were allegedly performed for Mr. Frysinger?

A. 'Partial phalangectomy resection, proximal phalanx, second toe,' meaning that the portion—the bone, the bone, the one that—closest to the foot itself in the second toe, that it was partially—that the bone in the toe was partially removed.

Q. All right, sir. Now, you have before you two other exhibits, I believe. I think you have Exhibit 39, which is a claim form, is it not?

A. Yes.

Q. And what's the date of that claim form?

A. 12–6–79. December the 6th, 1979, which was the month before.

Q. Exhibit 9?

A. Right.

Q. All right. And what, if anything, is shown in Exhibit 39 as having been done for Mr. Frysinger?

A. 'Head resection of the proximal phalanx for correction of hammertoe deformity in the second toe of left foot.'

Q. Now, Doctor, if you would look, please, at the medical chart for Mr. Frysinger, which is Exhibit 40, and look at the two dates, the dates for the claim form, Exhibit 9, which is 10 January, '80, and the chart for December 6th, 1979, the month before,—

A. Yes?

Q. —first of all, for the December entry, the 6 December '79 entry, what is shown there, sir?

A. Nothing, but it says, 'See op report; surgery today.'

Q. Do you find an op report there, sir?

A. No, I do not.

Q. What significance, if any, can you attach to that, sir?

A. That the chart tells us nothing.

Q. There's no documentation of procedure having been performed?

A. No documentation of what procedure. It just says, 'See the op report,' which is not in the chart. [This reference is to the December 6 procedure, not the procedure underlying Count IX.]

Q. So the chart contains, as I think you said, no documentation of anything having been done that day?

A. Correct.

Q. Now, for the 10th of January, 1980, what does the chart indicate?

A. 'Surgery today. Diagnosis: painful, painful fracture and dislocation, causing contracted hammertoe deformity, second metatarsal phalangeal joint, left foot.' There's a couple of words I cannot read, sir.

Q. All right, Doctor. Well, given your examination, Doctor, of the information in Exhibit 40 and the information in Exhibit 39, what conclusion, if any, can you give us based on your medical opinion as to the accuracy, the claim for services performed in Exhibit 9?

A. That they were not performed."

R. II, 117–19.

■ Dr. Haas gave no reasons for his conclusion. Apparently he thought defendant could have performed the procedure only once. Yet he did not explain whether the two procedures charged for are identical or, if so, whether it would be possible to perform the same procedure twice. The jury had no basis for assessing what weight to give Dr. Haas' testimony. Therefore, we cannot sustain the conviction on this count.

## Count X

Count X charged that defendant submitted a claim for services not actually rendered to Adelina Baca on July 10, 1980. In regard to that count the prosecution and Dr. Haas engaged in the following exchange:

"Q. Exhibits 10 and 11 are claim forms for whom, sir?

A. Adelina Baca.

Q. And the one marked Exhibit 10 indicates surgery on what date, sir?

A. August 6th, 1980.

Q. Now, with reference to the one marked Exhibit 10, what surgical procedures were performed as reflected on that document?

A. 'Partial excision of the phalanx, the great toe, right foot,' meaning a part of the bone taken out of the big toe.

Q. And on Exhibit 11, Dr. Haas, the date being 6 August, 1980, what do you have there for a claimed surgical procedure?

A. 'Partial excision of phalanx, great toe.' This says 'left foot.'

Q. Is that fundamentally the same procedure?

A. Correct.

Q. Now, let me ask you to look at Exhibit 41, sir. It's in the envelope. Are they a number of x-rays, Doctor?

A. Right. Correct.

Q. Will you look at the x-rays and tell us, if you can, whether there is any indication that the work claimed on the 10th of July, 1980, was performed?

A. Sorry for the delay.

Q. It's quite all right, Doctor.

A. There is no indication on this x-ray dated July the 10th, 1980 that there was such surgery done. This x-ray is dated July the 21st.

Q. 11 days afterwards?

A. 11 days later. It does not show that that surgery had been done.

Q. Very well, sir. Doctor, you have also before you the medical chart of Adelina Baca. It is marked Exhibit 42. I wonder if you would be kind enough to look in there for the date, July 10, 1980, and tell us what procedure, if any, was done?

A. It says: 'Excision of painful hyperostosis,' which means enlargement of bone from the great toe, 'left foot.' [1]

Q. Is there an operative report there, Doctor?

A. There is none.

Q. Is it, in the absence of the operative report, possible to document, in the normal medical fashion, the performance of those services?

A. No, it is not."

R. II, 120–22.

Dr. Haas did not state whether the x-rays would necessarily show that the procedure had been performed, nor did he state what would appear on the x-rays if the procedure had been performed. Even if we view Dr. Haas' testimony as positively declaring that defendant did not perform the operation on July 10 because the before and after x-rays showed no bone loss, we cannot affirm the conviction. On cross-examination defense counsel asked Dr. Haas twice whether the x-rays showed that the procedure had not been performed. Dr. Haas did not answer the question. R. III, 13–15. A criminal conviction may not be sustained when the sole government witness gave contradictory testimony and the government neither asked him to explain the conflict nor presented other evidence on the issue. *United States v. Dumas*, 688 F.2d 84, 88 (10th Cir.1982). Considering Dr. Haas' failure to explain the basis for his opinion, his uncertainty as to whether the operation was performed, and the confusion about which foot was involved, we

---

**1.** Neither party pursued the inconsistency between the claim for a procedure on the right foot and Dr. Haas' interpretation of one scrawl on the chart as an "L" standing for "left." Both Dr. Haas' testimony and defendant's testimony focused on whether defendant had performed a procedure on the right foot. Indeed, when the prosecution asked defendant to read from the same chart entry, defendant read the scrawl under "Chief Complaint" as "pain, great toe, right foot." The prosecution did not challenge defendant's reading.

hold that no reasonable jury could find defendant guilty beyond a reasonable doubt on the basis of Dr. Haas' testimony.

### Count XIV

Count XIV charged that defendant submitted a claim for services not actually rendered to Antonio Parsen. The claim was for an arthrotomy of the fifth metatarsal phalangeal joint of the left foot supposedly performed on September 3, 1981. Dr. Haas testified that this was the "removal of a joint." R. II, 129. In testifying that defendant did not perform the procedure, Dr. Haas relied on an operative report which stated that the incision was closed with steel sutures. R. II, 130–31. Dr. Haas looked at an x-ray of Mr. Parsen's foot taken on September 28, 1981, and stated that he saw no steel sutures on the x-ray. R. II, 131. He also stated that steel sutures show up plainly on x-rays. R. II, 131. Dr. Haas stated that there were no other indications on the x-ray that an arthrotomy had been performed. In light of his testimony that arthrotomy is the removal of a joint, we believe a jury could find that this testimony meant that no joint had been removed.

Defendant testified that he had performed the arthrotomy. He testified that an arthrotomy is an incision into a joint and that it does not show on an x-ray. R. III, 180, 202–03. Defendant also stated that the reference to steel sutures was a mistake attributable to his use of stock operative reports. R. II, 202–03. Patricia De-Graff, a former employee of defendant, testified at the beginning of the trial that defendant sometimes used stock operative reports. R. II, 65.

█ Unrebutted testimony by Dr. Haas would have been sufficient for the jury to convict defendant on count XIV. Defendant's testimony differed from that of Dr. Haas on the interpretation of the term arthrotomy and is supported by at least one medical dictionary. We do not have to decide whether this conflict alone would make the evidence insufficient to support a conviction because there is the additional evidence about the steel sutures. We hold that a reasonable jury could believe that defendant lied about the sutures and lied about performing the arthrotomy, whether that operation involves removing a joint or cutting into it. Thus, we find the evidence sufficient to support a conviction on count XIV.

### Counts XV and XIX

Counts XV and XIX charged that defendant submitted claims for services not actually rendered to Ana Marie Torres. Count XV was based on a claim for a total matrisectomy on the large toe of the left foot on March 27, 1980. Dr. Haas explained that a total matrisectomy is the removal of the entire nail root so that the nail would not regrow. R. II, 133. The prosecution showed Dr. Haas previous claims for the same procedure and asked him, "Doctor, based on the [previous claims], what is your professional opinion concerning the work billed for on the 27th of March, 1980"? Dr. Haas replied, "It would be impossible. They had been removed twice before." R. II, 134. Count XIX was based on a claim for a total matrisectomy on the large toe of the right foot on April 9, 1981. Again, the prosecution showed Dr. Haas two previous claims for the same procedure. Dr. Haas stated that it was not possible that defendant performed a matrisectomy on April 9, 1981. R. II, 138. The jury convicted defendant on those two counts.

█ Dr. Haas based his conclusions as to both of these counts on identical circumstantial evidence: (1) previous claims for the same procedure, (2) Dr. Haas' experience that ninety-nine out of one hundred total matrisectomies are successful, and (3) his knowledge that a successful total matrisectomy need never be redone. Additionally, in some cases one matrisectomy followed another by as little as five days. We need not decide whether Dr. Haas' testimony alone is sufficient to convict on these counts, because defendant's testimony established a variance between the procedures he charged for and those he per-

formed. On direct examination he testified:

"A. [defendant] . . . In this case, it was nail and the infected tissue which we incised. We drain and remove and then we usually put them on salts or a diet and tell them to stay in bed. We can usually do this a week or two.

Most people, in my practice, they don't stay in bed for a week. We try to get them back in bed a reasonable amount of time. Once we get that infection under control, then we can go deeper in the matrix and try to get the cells out wherever they may be, wherever they may be defending the matrix or roots, that's part of this problem.

Q. So this is really one procedure that's done in two stages?

A. Right. It's a two-stage procedure; incision, remove and drain infection, incision, nail, whatever the infection, we try to incise. Once we've got that calmed down, we can go back and do an exercise.

Q. Normally, when you do it this way, is it your policy or practice to get a consent from the patient on the first day of the first procedure for both days?

A. Right. There's an understanding that if it comes back, we should do whatever we have to do; if it's the same problem, to eradicate the problem, and we do tell this to all of our patients. They understand this. They are in pain, so they know they have to do something."

R. III, 186–87. Then on cross-examination:

"Q. [prosecutor] Doctor, Ms. Torres' left toe was of such unusual character that, just a week before you performed the total matrisectomy on her left toe, left great toe, on the 1st of August of 1979, in fact, less than that, you removed the entire nail plate, that is, on the 26th of July, 1979, on a 78-year-old woman who suffered from diabetes and other difficulties. You did that procedure.

Yet again, we're working backwards now; a week before the total matrisectomy, in fact less than a week, five days,

you removed the entire nail plate, am I correct?

A. Well, I removed what was there. It was that two-stage procedure. We removed whatever nail is there, draining infection.

Q. And sent in a claim to Medicare for it, Doctor?

A. And then followed up with a matrisectomy, weekly,—"

R. IV, 79–80. *See also* R. IV, 80–84.

### Count XXI

Count XXI charged that defendant submitted a claim for services not actually rendered to Matthew Touhey. Count XXI was based on a charge for a nail excision on the left big toe on May 5, 1980. Count XX, on which the jury acquitted defendant, was based on a charge for a nail excision on the left big toe on April 24, 1980. To prove both counts, the prosecution introduced a claim submitted for the total excision of the nail plate on the big toe of the left foot on November 24, 1979. Because of the November procedure, Dr. Haas testified, it would have been "very difficult, rather impossible" for Mr. Touhey to have a complete new nail by April 24, 1980. In regard to count XX the following exchange took place between the prosecution and Dr. Haas:

"Q. And as you've told us, extremely unlikely that on 4–24 1980, there was anything there that required removal, based on the procedures on 29 of November, 1979?

A. Correct.

Q. What's your conclusion, then, Doctor, based on your medical expertise as to the truth or falsehood as to the claims set out on the 5th of May, 1980?

A. The nail plate could not have been removed again on May the 5th. The matrisectomy, that is a possibility, the matrix."

R. II, 142.

■ Dr. Haas testified that an entire nail plate could not have grown by April 24, 1980. Yet the claims underlying counts XX and XXI, unlike the claim for the No-

vember procedure, did not charge for excision of the total plate. Earlier Dr. Haas testified that total regrowth of the nail plate of an elderly person would take approximately six months. Thus, after four months there would be significant regrowth. Defendant could have removed part of the regrowth on April 24, 1980, and the rest on May 5, 1980. Such procedures might have been wastefull or pointless, but not impossible. Thus, Dr. Haas' testimony does not support his conclusion that the claim for a nail plate excision on May 5, 1980, was necessarily false.

### Count XXII

Count XXII charged that defendant submitted a claim for services not actually rendered to Matthew Touhey. The prosecution introduced a claim defendant submitted for two x-rays of Mr. Touhey's right foot taken on May 9, 1980. The prosecution then showed Dr. Haas government exhibit 52, an x-ray marked "Matthew Touhey 5–9–80 Dr. Varoz." Dr. Haas examined the x-ray and stated that there was nothing on it and that it had no medical value. Although the prosecution did not prove that exhibit 52 was one of the x-rays defendant had charged for, defendant implicitly admitted that it was.

■ The government did not prove what the indictment charged. The indictment charged that defendant did not perform services he charged for. Defendant did take an x-ray. Hence, this conviction is not supported by the evidence.

### II

■ Defendant also argues the district court abused its discretion in permitting cross-examination of defendant regarding why a hospital refused to grant him permanent privileges and whether one of his employees quit because defendant asked her to cheat. Cross-examination may embrace any matter germane to direct examination, qualifying, modifying, or contradicting it. *Leeper v. United States*, 446 F.2d 281, 288 (10th Cir.1971), *cert. denied*, 404 U.S. 1021, 92 S.Ct. 695, 30 L.Ed.2d 671

(1972). We are satisfied that the inquiries were sufficiently related to defendant's testimony on direct that neither ruling constituted reversible error. Defendant testified as his own expert, explaining the medical procedures and how and why he did them. He disagreed with the government's expert on the meaning of "arthrotomy," and that dispute went to the heart of count XIV of the indictment. Thus, cross-examination related to his qualifications as an expert was relevant. The cross-examination regarding the employee who quit related to defendant allegedly asking her to fill out improperly an operative report. The inquiry was relevant to the "steel sutures" reference in an operative report which defendant claimed was an error. We cannot find that the trial court erred in permitting the questions.

Affirmed as to Counts XIV, XV, and XIX, Reversed as to Counts II, IX, X, XXI, and XXII.