UNITED STATES of America, Plaintiff–Appellee,

v.

**Sidney R. BELL, Defendant–Appellant.**

UNITED STATES of America, Plaintiff–Appellee,

v.

**Scott J. ZIEBARTH, Defendant–Appellant.**

Nos. 88–1396, 88–1585.

United States Court of Appeals, Tenth Circuit.

Dec. 22, 1989.

---

Kenneth R. Brown, Salt Lake City, Utah, for defendant-appellant Sidney R. Bell.

Ronald J. Yengich, Yengich, Rich, Xaiz & Metos, Salt Lake City, Utah, for defendant-appellant Scott J. Ziebarth.

Bruce C. Lubeck, Asst. U.S. Atty., Salt Lake City, Utah (Brent D. Ward, U.S. Atty., Salt Lake City, Utah, was also on the brief), for plaintiff-appellee U.S.

Before HOLLOWAY, Chief Judge, BARRETT and EBEL, Circuit Judges.

HOLLOWAY, Chief Judge.

These cases were companioned on appeal. Both defendants were found guilty by the court after waiving their rights to a jury trial. The trial court found defendant Scott Ziebarth (Ziebarth) guilty of possession with intent to distribute cocaine, a violation of 21 U.S.C. § 841(a)(1) (1982). Defendant Sidney Bell (Bell) was found guilty of attempt to possess with intent to distribute cocaine, a violation of 21 U.S.C. § 841(a)(1) and 846 (1982). Both defendants challenge the trial court's denial of their pre-trial motions to suppress and Bell additionally challenges the sufficiency of the evidence supporting his conviction. We affirm both convictions.

## I.

### *Factual Background*

Utah State Narcotics Agent Mark Whittaker (Whittaker) was profiling flights arriving from Los Angeles at the Salt Lake International Airport when Ziebarth deplaned. Ziebarth walked to a group of phones, looked around, and then turned and walked across a hallway to another group of phones. While looking around he picked up two or three phones, but did not appear to be placing a call. Ziebarth then went into a restroom for approximately two minutes and after leaving, went back to the phones. II R. 7–8. Whittaker said that Ziebarth appeared to be dialing this time, but did not appear to be talking. Ziebarth was carrying a nylon shoulder bag and appeared to Whittaker to be nervous. II R. 8–9.

Whittaker followed Ziebarth as he walked toward the east exit of the concourse. As Ziebarth got to the top of the concourse ramp he went into a lounge, looked around and then walked toward the top of an escalator where he met a man later identified as Sidney Bell. They greeted each other and then rode down the escalator. Whittaker was behind them and said that on the way down they turned away from each other and stopped speaking. II R. 10.

When he reached the bottom of the escalator, Whittaker met Deputy Bart Palmer (Palmer) of the Salt Lake County Sheriff's Office and Police Officer Terry Steed (Steed) of Murray City and explained his observations. Ziebarth and Bell walked to the east side of the building, turned around, and walked back to the far west end of the building. Whittaker said that Ziebarth was again looking over his shoulder and that Bell was turning around and looking. II R. 11–12.

Neither Ziebarth nor Bell went to the luggage area before going out the west exit of the terminal. As they were walking toward a parking lot, Bell noticed Whittaker and Palmer walking toward him and Ziebarth, and he turned and walked away from Ziebarth. II R. 13. At that point Whittaker and Palmer approached Ziebarth. Steed, who was nearby, approached Bell.

### A.

### *Facts Leading to Bell's Arrest*

Steed walked up to Bell with his badge showing and said "I'm a police officer, do you mind if I talk to you a minute" and Bell said yes. Steed testified that he then asked if Bell was a friend of Ziebarth's. III R. 50. When Bell said "No," Steed asked "Aren't you a friend of his, aren't you with him or a friend of his?" Bell

responded "Not really". III R. 50.[1] A brown paper bag was protruding from a rolled-up levi jacket under Bell's arm. Steed said that Bell was turning his right shoulder in an attempt to hide the jacket. III R. 50. When asked, Bell said there was nothing in the bag. Steed again inquired about the contents of the bag and Bell told him it was personal. III R. 51. Steed then asked: "Do you mind if I touch that bag for my own safety, assure myself that it's not a weapon or anything that could be used as a weapon?" Bell said "No, it's personal, it's not a weapon. You don't have to worry about it." III R. 51.

At this point Steed told Bell that he was a narcotics officer assigned to keep narcotics from entering Utah through the airport. Steed testified that Bell's "level of nervousness seemed to increase dramatically. I noticed that he was breathing—started breathing a little heavier." III R. 51–52. Steed then asked Bell why he was so nervous and Bell said, "I'm always nervous when I'm confronted by police." Bell then changed the word confronted to "talked to." III R. 52. Steed asked if there was anything in the bag to cause him to be nervous and he said no, almost blurting it out, according to Steed. III R. 52. Steed then motioned Whittaker over, introduced him to Bell, and told him about the package. He also told Whittaker that Bell had first denied knowing Ziebarth and then, when asked again, said that he did not really know him. III R. 52.

Whittaker told Bell that he was going to "detain the package and that [they] would go over into the other building right next to [them], and [that he] was going to run his narcotics dog over the package at that time." III R. 16–17. Whittaker testified that Bell "didn't want me to do it at first"

and that Bell asked if Whittaker could legally talk to him and if he could detain the package. III R. 17. Whittaker said he could and told Bell that he could either have a receipt for the package and could get it back when the dog was done, or could accompany him to the office. III R. 17.[2] Bell said "I don't want you to look at the package...." III R. 43. Whittaker did not tell Bell he was free to leave, III R. 42, but he did tell him that it would only take a few minutes for the dog to go over the package. Whittaker said that Bell agreed to go to the office. III R. 17–18.

Carrying his package, Bell walked to the security office, located approximately 200 feet away in the main terminal. When they got to the office Whittaker told Bell that he would "take the package upstairs and run the dog over it." III R. 17–19. Whittaker said that Bell "didn't want me to take the package. He knew I was going to have the package." III R. 19. Bell told Whittaker that he wanted to go with him to the office and was advised that "it was just [Whittaker's] policy that [he] did not have anyone else around the dog when [he] was working...." III R. 20. Whittaker said: "He told me, again, that I wasn't going to have the package. At this time I took out my radio and I was going to call for assistance. He said, 'oh well, never mind,' and he handed me the package." III R. 20. By now Whittaker and Bell had been together for approximately two or three minutes. III R. 25.

The narcotics dog, "Blue," alerted to the package. Blue was then taken to the far side of the room and let go and again alerted to Bell's package. Whittaker had placed the package on the floor among two other pieces of luggage. This process took

1. There is a conflict in the testimony at this point. The parties stipulated that Bell would testify that when he was confronted by Officer Steed outside the airport on the day of the arrest, "that he did not deny knowing Mr. Ziebarth, that the question was 'Did you come in with Mr. Ziebarth,' and to that question he responded 'No.'" V R. 3. This conflict was not resolved by the Magistrate's findings. The Magistrate's report did state that as to the conflict between Officer Whittaker's testimony and Bell's as to whether Bell made a statement that

Whittaker could open the package, it was found the facts were as stated by Whittaker, not as stated by Bell. I R. 50, p. 12. Whittaker had testified that Bell said "that was fine" (opening the package and counting the money). *Id.* at 12.

2. The parties stipulated that Bell would testify that Whittaker requested that he go to the security office and did not give him the option. V R. 3–4. The magistrate specifically credited Whittaker's testimony on this point. I R. 50, p. 12.

approximately one and one half minutes. III R. 21, 25, 26.

Whittaker then went downstairs and told Bell that he wanted him to come up. They went upstairs to the security office and Whittaker informed Bell that Blue had alerted to the package. Bell again denied that the package contained narcotics. Whittaker told Bell that because Blue had alerted to the package, he would place Bell under arrest. He then read Bell his *Miranda* warnings. At that point Bell told Whittaker that the package contained money. III R. 27–28.

During this time the package was on the floor, five to ten feet away. Whittaker said that he would open the package, count the money, and give Bell a receipt, and Bell indicated that would be fine. III R. 28.[3] The package contained $13,800. III R. 30.[4] Bell was given a receipt for the money, he asked a few questions, and was released. III R. 30.

### B.

*Facts Leading to Ziebarth's Arrest*

As officer Palmer approached Ziebarth, he identified himself and asked Ziebarth if he would mind talking for a moment. Ziebarth said no, and Palmer asked if he was waiting for someone. Ziebarth responded that Bell had picked him up and that he was not waiting for anyone. Palmer then asked if he could see Ziebarth's plane ticket. II R. 38, 39. Whittaker, who at that point had not yet gone over to help with Bell, said that Ziebarth was "just a little nervous" at this point. II R. 28. Ziebarth found the ticket and showed it to Palmer, who then checked Ziebarth's driver's license to verify the name on the ticket. II R. 39.

Palmer handed the license back to Ziebarth and told him that he was a narcotics officer and that he often stopped people in an attempt to locate narcotics. According to Palmer, Ziebarth then became "visibly nervous" and started looking around. II R. 39–40. Palmer asked if he could look through Ziebarth's nylon bag and advised him of his right to refuse. II R. 29, 40. Ziebarth handed the bag to Palmer who searched it, found nothing, and returned it to Ziebarth. II R. 30, 40. It was at this point that Whittaker went to help Steed with Bell. II R. 30.

Palmer noticed some zippered pockets on the shoulder of Ziebarth's jacket and he asked if he could search them. Ziebarth asked why and was told by Palmer that he was looking for drugs. II R. 40. Ziebarth reached up to unzip one of the pockets and as he did, Palmer noticed his hand "shaking very badly and he was unable to get a hold of the zipper for a couple of seconds...." He pulled out partially what appeared to be a manila envelope. Palmer asked what was in it and Ziebarth said money, about $3,000. II R. 41. Palmer questioned Ziebarth about the money (Ziebarth had previously said he did not have large amounts of money), and Ziebarth responded, "well, it's not a large amount of money to me." Palmer pointed to the other pocket and Ziebarth responded "more money," but did not explain. Palmer then said "well, do you think it's about the same as in the manila envelope" and Ziebarth said he had about $7,000 total on him. II R. 41.

Palmer asked Ziebarth what he was doing with the money and Ziebarth indicated that it was for an attorney who had done some mortgage foreclosure work in Hawaii. Ziebarth had just come from Hawaii and Palmer asked him why he had not paid the attorney while there. He explained that he was going to get a cashier's check and mail it and he pulled out a pre-addressed envelope and showed it to Palmer. Palmer then told Ziebarth that he was going to detain him until he could determine "whose money it was and why he had it."

---

3. There is an important factual dispute here. The parties agreed that Bell would testify, if called, that Whittaker dumped the contents of the package out. The magistrate specifically credited Whittaker's testimony. I R. 50, p. 12. This finding is not clearly erroneous.

4. There was testimony that Blue could alert to either narcotics or money that had any connection to narcotics. III R. 54. The magistrate found that Blue was "responding to the stimulus, the fact that the subject matter was different was not of consequence." I R. 50, p. 37, n. 22.

II R. 42-43. He told Ziebarth it would probably be just a few minutes. II R. 57. For all that Palmer knew, there was money in the packages in Ziebarth's shirt or coat. II R. 56.[5]

By that time Whittaker was taking Bell to the office. Palmer informed Ziebarth of that fact and asked him if he would mind going to the office to get this "money situation straightened out." II R. 43. According to Palmer, Ziebarth said "fine and [they] walked over to the office." II R. 43. At that point they had been together for seven or eight minutes. II R. 44.

When they got to the office Whittaker was upstairs with Blue and Bell was waiting. II R. 44. By then, two other security people were present. While they were standing there, Ziebarth dropped his bag and bolted down the concourse. II R. 45. He was tackled by one of the security officers 70 or 80 feet down the concourse and arrested. A subsequent search revealed ten and one half ounces of cocaine. II R. 46-47.

The magistrate's Report states, p. 7, that in addition "the money" was found in Ziebarth's pockets. However, the Memorandum Decision of the trial judge at p. 5 says that at oral argument the parties stipulated that Ziebarth was carrying "only cocaine and no money." See VI R. 35-36. The government attorney said the magistrate's Report was in error on this point.

## C.

### The Trial Court's Ruling

Adopting the magistrate's report and recommendation after a *de novo* review of the record, with the correction noted above that money was not found on Ziebarth, the trial court denied both motions to suppress. The magistrate found Ziebarth's conduct consensual up to the point where Palmer said he was going to detain him to check the source of the money. The magistrate found that from that point on Palmer had reasonable suspicion to temporarily detain Ziebarth. When Ziebarth bolted, probable cause was supplied for his arrest and the narcotics were seized pursuant thereto. I R. 50, p. 33-34.

With respect to Bell, the magistrate found the initial encounter a consensual police-citizen encounter. I R. 50, p. 35. The magistrate reasoned that Bell, who was given the option of accompanying Whittaker or taking a receipt for the package, was never detained. The magistrate found sufficient justification to temporarily detain the package for a dog sniff, reasoning that Ziebarth's and Bell's conduct could be added together to determine whether there was reasonable suspicion to believe the package contained narcotics or narcotics money. The magistrate found that when Blue alerted, there was probable cause to arrest Bell. I R. 50, p. 36. The magistrate held, however, that the search of the package was not incident to Bell's arrest. Rather, the magistrate reasoned that the "search of the package was voluntary and consented to by Bell," who told Whittaker (after Blue alerted) that the package contained money. I R. 50, p. 37. The trial court agreed. I R. 55, p. 6.

Both defendants waived their right to a jury trial. The prosecution relied on the evidence presented in connection with the motions to suppress. It also proffered some additional testimony and exhibits, to which the defendants agreed. VII R. 9-18. The defense put on no evidence, but did object to some of the evidence proffered by the government. VII R. 18-24. The court found Ziebarth guilty of possession with intent to distribute and Bell guilty of an attempt to possess with intent to distribute. VII R. 30-32.[6]

On appeal, Ziebarth argues that he was detained without reasonable suspicion

---

**5.** Ziebarth asserts throughout his brief that Palmer had possession of the money. We find nothing in the record to support this assertion and the magistrate specifically found that at "no time did any officer take possession of the defendant's property, at least at this time." I R. 50, p. 33.

**6.** The court announced its decision orally. Neither defendant requested detailed findings under Fed.R.Crim.P. 23(c).

when Palmer asked to inspect his ticket and identification and that the intrusion escalated further when Palmer asked if he could search his person and luggage. He also argues that he was arrested without probable cause when he was asked to accompany Palmer to the security office. Bell says that his package was seized without consent or reasonable suspicion and that there was insufficient evidence to support his conviction.

## II.

### Analysis

When reviewing the denial of a motion to suppress we accept the trial court's findings of fact unless they are clearly erroneous. *United States v. Maez*, 872 F.2d 1444, 1455–56 n. 15 (10th Cir.1989). We must consider the evidence adduced at the suppression hearing and the trial in the light most favorable to the ruling made. *United States v. Gay*, 774 F.2d 368, 375 (10th Cir.1985).

### A.

### Ziebarth's Detention and Arrest

■ The initial contact between Palmer and Ziebarth, where Palmer asked Ziebarth if he would mind talking for a moment, was clearly the sort of encounter that implicates no Fourth Amendment interests, as the magistrate reasoned. *Florida v. Rodriguez*, 469 U.S. 1, 5–6, 105 S.Ct. 308, 310–11, 83 L.Ed.2d 165 (1984) (per curiam). "[L]aw enforcement officers do not violate the Fourth Amendment by merely approaching an individual on the street or in another public place, by asking him if he is willing to answer some questions, [or] by putting questions to him if the person is willing to listen...." *Florida v. Royer*, 460 U.S. 491, 497, 103 S.Ct. 1319, 1324, 75 L.Ed.2d 229 (1983) (opinion of White, J., in which Marshall, Powell, and Stevens, JJ., joined). *See also United States v. Santillanes*, 848 F.2d 1103, 1106 (10th Cir.1988) (citing *United States v. Cooper*, 733 F.2d 1360, 1363 (10th Cir.1984)), *cert. denied*, 467 U.S. 1255, 104 S.Ct. 3543, 82 L.Ed.2d 847 (1984) and *United States v. Espinosa*,

782 F.2d 888, 890 (10th Cir.1986), (recognizing three types of police-citizen encounters).

Ziebarth argues that any consent ended when Palmer requested permission to inspect his ticket and identification. He contends that the intrusion escalated further when Palmer identified himself as a narcotics officer and asked to inspect his luggage and search his person. The government argues, and the magistrate and trial judge found, that Ziebarth consented to the examination of his ticket and identification, as well as the search of his bag and coat pockets. I R. 50, p. 32–33; I R. 55, p. 3.

■ Where a valid consent is obtained, no Fourth Amendment rights are violated. *Gay*, 774 F.2d at 376. Whether consent is voluntary or is the product of duress or coercion, express or implied, is to be determined by the totality of the circumstances and is a matter which the government has the burden of proving. *United States v. Mendenhall*, 446 U.S. 544, 557, 100 S.Ct. 1870, 1878, 64 L.Ed.2d 497 (1980) (opinion of STEWART, J., in which BLACKMUN, POWELL, and REHNQUIST, JJ., joined) (citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 222, 227, 93 S.Ct. 2041, 2045, 2047, 36 L.Ed.2d 854 (1973)). Knowledge of the right to refuse consent is "one factor to be taken into account...." *Schneckloth*, 412 U.S. at 227, 93 S.Ct. at 2048. This court has explicated a three-tier standard for determining whether the government has sustained the burden of showing that consent was voluntary:

First, there must be clear and positive testimony that the consent was unequivocal and specific. Second, the Government must establish that the consent was given without duress or coercion. Finally, we evaluate those first two standards with the traditional indulgence of the courts against a presumption of waiver of constitutional rights.

*Gay*, 774 F.2d at 376 (citing *United States v. Recalde*, 761 F.2d 1448, 1453 (10th Cir. 1985) and *United States v. Abbot*, 546 F.2d 883, 885 (10th Cir.1977)).

As with the initial encounter in *Mendenhall*, the events here took place in a public concourse and without a display of weap-

ons. *See Mendenhall*, 446 U.S. at 555, 100 S.Ct. at 1877 (opinion of STEWART, J., in which REHNQUIST, J., joined). Considering the evidence in the light favorable to the trial court's ruling, Officers Palmer and Whittaker did not summon Ziebarth to their presence, but rather approached him. *Id.* They requested, but did not demand to see, Ziebarth's ticket and identification. After verifying the name on the ticket and identifying himself as a narcotics officer, Palmer asked Ziebarth's permission to look through his bag. He advised Ziebarth of his right to refuse consent. II R. 29, 40. Ziebarth handed the bag to Palmer who, after finding nothing, returned it. II R. 30, 40. When Ziebarth was asked about the zippered pockets on his jacket, he reached up himself, unzipped the pockets and handed Palmer the envelope which he said contained about $3,000. II R. 41. And when Palmer pointed to the other pocket, Ziebarth responded "more money" and then explained that he had a total of about $7,000 which he was going to use to pay an attorney. II R. 42.

■ We think there is ample support in the record to sustain the trial court's finding that Ziebarth's consent was valid. *See Mendenhall*, 446 U.S. at 557, 100 S.Ct. at 1877 (opinion of Stewart, J.) (examining the record to determine whether it sustains the trial court's finding of consent); *Gay*, 774 F.2d at 377. Ziebarth's knowledge of the right to refuse consent is "highly relevant to the determination that there had been consent." *Mendenhall*, 446 U.S. at 558–59, 100 S.Ct. at 1880 (opinion of Stewart,

J.). And there was no testimony showing threats or a show of force, *id.* at 558, 100 S.Ct. at 1879, or mere "submission to a claim of lawful authority." *Florida v. Royer*, 460 U.S. at 497, 103 S.Ct. at 1324 (opinion of White, J.).[7] We therefore uphold the finding that Ziebarth consented to the examination of his ticket, as well as the search of his bag and coat pockets.

■ We shall assume, without deciding, that Ziebarth's conduct was no longer consensual when Palmer told him he was going to be detained until it could be determined to whom the money belonged.[8] Ziebarth argues that at this point he was under arrest without probable cause. We disagree. Ziebarth was being temporarily detained only so that Palmer could confirm the explanation about the money he said he had. Palmer told Ziebarth that he would be detained only a few minutes. Then they went to the security office, located approximately 200 feet away in the main terminal. The entire encounter took place in public.

A temporary detention for questioning is "permissible because of the 'public interest involved in the suppression of illegal transactions in drugs or of any other serious crime.'" *Florida v. Rodriguez*, 469 U.S. at 5, 105 S.Ct. at 310 (per curiam) (quoting *Royer*, 460 U.S. at 498–99, 103 S.Ct. at 1324–25 (opinion of White, J.)). Such investigative detentions must "last no longer than is necessary to effectuate the purpose of the stop." *Royer*, 460 U.S. at 500, 103 S.Ct. at 1325. And the scope of such a detention must be "carefully tailored to its

---

7. We are unpersuaded by Ziebarth's argument that *Florida v. Royer*, 460 U.S. 491, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983) (opinion of White, J.) is controlling here. In *Royer*, the Court rejected the state's claim of consent, reasoning that "[a]sking for and examining Royer's ticket and his driver's license were no doubt permissible in themselves, but when the officers identified themselves as narcotics agents, told Royer that he was suspected of transporting narcotics, and asked him to accompany them to the police room, while retaining his ticket and driver's license and without indicating in any way that he was free to depart, Royer was effectively seized...." *Id.* at 501, 103 S.Ct. at 1326 (opinion of White, J.).

Ziebarth's argument is premised in part upon his contention that "instead of returning [Zie-

barth's] money the police kept it." Appellant's Brief, p. 14. As we have noted, *see* supra n. 5, the magistrate specifically found to the contrary and we have found nothing in the record to indicate that this factual finding is clearly erroneous. *Maez*, 872 F.2d at 1455–56 n. 15. Unlike defendant Royer, who was told he was being taken to the security office and did not respond, Ziebarth was asked if he would go and said yes. II R. 43.

8. The magistrate found that consent had ceased at this point, while the trial court found (as the government argues) that Ziebarth's conduct was consensual until he dropped his bag and bolted. I R. 55, p. 3.

underlying justification." *Id.* Here, Ziebarth's detention was a temporary investigatory one, lasting only approximately eight minutes, and was carefully tailored to its underlying justification.

It remains to be determined whether the temporary detention of Ziebarth was justified. Temporary detentions for questioning may be justified if " 'there is articulable suspicion that a person has committed or is about to commit a crime.' " *Florida v. Rodriguez,* 469 U.S. at 5, 105 S.Ct. at 310 (quoting *Florida v. Royer,* 460 U.S. at 498, 103 S.Ct. at 1323) (opinion of White, J.). In *United States v. Sokolow,* —— U.S. ——, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989), the Court stated that the concept of reasonable suspicion cannot be reduced to a neat set of legal rules, but rather, depends on the "totality of the circumstances—the whole picture." *Id.* 109 S.Ct. at 1585. The Fourth Amendment requires "some minimal level of objective justification" for making a stop and the officer must be able to "articulate something more than an 'inchoate and unparticularized suspicion or "hunch".' " *Id.* (quoting *INS v. Delgado,* 466 U.S. 210, 217, 104 S.Ct. 1758, 1763, 80 L.Ed.2d 247 (1984) and *Terry v. Ohio,* 392 U.S. 1, 27, 88 S.Ct. 1868, 1883, 20 L.Ed.2d 889 (1968)). "That level of suspicion is considerably less than proof of wrongdoing by a preponderance of the evidence." *Id.*

■ Under *Sokolow,* we think Palmer had reasonable suspicion to detain Ziebarth. After deplaning Ziebarth repeatedly went to a group of phones and did not appear to be talking. He appeared nervous to Palmer and had no luggage besides his shoulder bag. After meeting Bell, who was carrying a package in a rolled-up levi jacket, they walked to the east side of the building, turned around, and walked back to the west side. Ziebarth was again looking around and Bell turned around. When Bell saw Palmer and Whittaker approaching, he turned away from Ziebarth, apparently trying to conceal the fact that they had been together. Upon being told Palm-

er was a narcotics officer, Ziebarth became "visibly nervous" and started looking around. Palmer said that when Ziebarth went to unzip his pockets his hand was shaking badly. And when asked to explain the money he said he was carrying, Ziebarth said that he was going to use it to pay an attorney in Hawaii, the place from which he had just come.

It is true, as in *Sokolow,* that any one of these facts is "not by itself proof of any illegal conduct and is quite consistent with innocent travel." *Sokolow,* 109 S.Ct. at 1586. But even wholly lawful conduct may justify the suspicion that criminal activity is afoot. *Id.* at 1586–87. We hold that Palmer had a reasonable suspicion that Ziebarth was transporting illegal drugs and that the scope of the detention was reasonable. When Ziebarth dropped his bag and ran down the concourse, probable cause was supplied for his arrest. The cocaine was thereafter validly seized in a search of Ziebarth's person, incident to his arrest. *Weeks v. United States,* 232 U.S. 383, 392, 34 S.Ct. 341, 344, 58 L.Ed. 652 (1914). The detention and arrest of Ziebarth did not violate the Fourth Amendment and we find no error in the trial court's denial of his motion to suppress.

## B.

### *The Detention of Bell's Package and Bell's Arrest*

■ The magistrate found that Steed's initial encounter with Bell, whom he questioned about Ziebarth and the package he was carrying, was a permissible police-citizen encounter, implicating no Fourth Amendment rights. I R. 50, p. 35. We agree.

■ When Steed and Whittaker took Bell's package, however, a seizure occurred. *United States v. Place,* 462 U.S. 696, 707–09, 103 S.Ct. 2637, 2644–45, 77 L.Ed.2d 110 (1983).[9] In *Place,* the Court recognized that "some brief detentions of personal effects may be so minimally intru-

---

**9.** Both the magistrate and the trial judge found that Bell had not been detained. I R. 50 p. 36; I R. 55 p. 6. Bell was given the choice of taking a receipt for the package or accompanying Whittaker to the security office. III R. 17. The findings are not clearly erroneous.

sive of Fourth Amendment interests that strong countervailing governmental interests will justify a seizure based only on specific articulable facts that the property contains contraband or evidence of a crime." *Id.* at 706, 103 S.Ct. at 2644. The Court applied the principles of *Terry*, reasoning that when the nature and extent of a detention are minimally intrusive of the individual's Fourth Amendment interests, "the opposing law enforcement interests support a seizure based on less than probable cause." *Id.* at 703, 103 S.Ct. at 2642.

■■■ We think the detention of Bell's package was such that the seizure required only a "reasonable, articulable suspicion, premised on objective facts" that the package contained contraband or evidence of a crime. *Id.* at 702, 103 S.Ct. at 2642. Bell was not travelling, so there was no intrusion on any travel plans as in some cases. *See e.g., id.* at 708, 103 S.Ct. at 2645. The detention lasted only some five minutes. *Id.* at 709, 103 S.Ct. at 2645. Bell was told that the package was being taken to a security office and that it would take only a few minutes for the dog to go over the package. III R. 17–18. The seizure required only reasonable articulable suspicion.

■■■ Under *Sokolow*, officers Steed and Whittaker had the requisite "minimum level of objective justification" to seize Bell's package. *Sokolow*, 109 S.Ct. at 1585. As the magistrate reasoned, Ziebarth's conduct could be added to Bell's, up to the point at which Whittaker left Ziebarth to assist Steed with Bell, for the purpose of determining whether reasonable suspicion existed. Ziebarth and Bell walked to the east side of the building together, turned around, and walked back again. Bell turned, and when he saw Palmer and Whittaker approaching, turned away from Ziebarth, apparently trying to conceal the fact that they had been together. Steed testified that Bell's "level of nervousness

seemed to increase dramatically" when he was told that Steed was a narcotics officer. III R. 52. Bell turned his body in an attempt to keep the package away from Steed. III R. 50. Taken together, *see Sokolow*, 109 S.Ct. at 1586, these facts supplied reasonable suspicion to seize Bell's package for a limited examination by the dog. *See Place*, 462 U.S. at 706–08, 103 S.Ct. at 2644–45. *Accord United States v. Stone*, 866 F.2d 359, 362–63 (10th Cir.1989).

The detention lasted only a few minutes and was minimally intrusive. It did not exceed the permissible limits of a *Terry*-type investigative stop. *See Place*, 462 U.S. at 708–10, 103 S.Ct. at 2645–46; *Florida v. Royer*, 460 U.S. at 506, 103 S.Ct. at 1329 (opinion of White, J.) ("If [trained narcotics detection dogs] had been used, Royer and his luggage could have been momentarily detained while this investigative procedure was carried out."). When Blue alerted to the package, *see* III R. 25–26, probable cause was supplied for Bell's arrest. The package was then searched incident to Bell's arrest. *Chimel v. California*, 395 U.S. 752, 762–63, 89 S.Ct. 2034, 2039–40, 23 L.Ed.2d 685 (1969). The temporary investigative detention of Bell's package for a limited dog sniff, Bell's subsequent arrest, and the search of the package incident to the arrest, did not violate the Fourth Amendment. Again there was no error in the denial of the motion to suppress.[10]

## C.

### *The Sufficiency of the Evidence as to Bell*

■■■ Bell was found guilty of attempt to possess a controlled substance with intent to distribute, a violation of 21 U.S.C. §§ 841(a)(1) and 846 (1982). He argues that the evidence was insufficient to support his conviction. The evidence showed that Ziebarth possessed ten and one half

---

10. The government argues, and the magistrate and trial court found, *see* I R. 50, p. 37; I R. 55, p. 6, that Bell consented to the search of the package. *See* footnote 3, *supra*. This provides an additional ground for the search of the package. We need not discuss the issue in detail,

however. Probable cause for Bell's arrest was supplied when Blue alerted to the package. The package was only five or ten feet away from Bell when he was arrested and was properly searched incident to his arrest.

ounces of cocaine and had a piece of scratch paper with $13,800 written on it. VII R. 16. Bell had $13,800. III R. 30. The trial judge could reasonably infer that Bell was going to purchase Ziebarth's cocaine and there was testimony that such an amount of cocaine would not be for personal use, but instead, for distribution. VII R. 17. Viewed in the light most favorable to the government, the evidence was sufficient for the trial court to find Bell guilty beyond a reasonable doubt. *United States v. Varoz*, 740 F.2d 772, 774–75 (10th Cir. 1984).

AFFIRMED.

EBEL, Circuit Judge, concurring in part and dissenting in part.

The majority has carefully and objectively detailed the relevant facts in these combined appeals. Although I join the portion of the majority opinion affirming the conviction of defendant Ziebarth, I respectfully dissent from the majority's conclusion that the officers had a "reasonable, articulable suspicion" justifying the seizure [1] of defendant Bell's package.

The district court adopted the magistrate's report and recommendation, concluding that the officers had a "reasonable suspicion to believe the package contained either narcotics or money." I R. at 36, 55. On the basis of Bell's total conduct, the majority affirms the district court's legal conclusion [2] that the facts "supplied reasonable suspicion to seize Bell's package for a limited examination by the dog." I R. at 36; Maj. op. at 968. Reviewing all of the

objective facts introduced at trial together, I do not believe that reasonable suspicion is established in this case. Of course, I recognize that individual acts consistent with innocent travel, when viewed together, may give rise to a reasonable suspicion of criminal activity. *See United States v. Sokolow*, —— U.S. ——, 109 S.Ct. 1581, 1586, 104 L.Ed.2d 1 (1989). Nevertheless, I believe a review of Bell's conduct demonstrates that this is not such a case.

After Ziebarth met Bell in the lounge, they rode down the escalator together. II R. at 10. Evidently, on the way down they turned away from each other and stopped speaking. II R. at 10. The defendants failure to sustain conversation is not particularly suspicious behavior. *Cf., Reid v. Georgia*, 448 U.S. 438, 440–41, 100 S.Ct. 2752, 2753–54, 65 L.Ed.2d 890 (1980) (agent's hunch that defendant and companion were attempting to conceal the fact that they were traveling together insufficient to support "reasonable and articulable suspicion" justifying seizure of defendant).

Similarly, the defendants walk through the airport was not suspicious. They walked first to the east end of the airport terminal and then turned and walked to the west end. Once outside, they returned to the east end of the terminal. II R. at 13. This behavior cannot be characterized as strange or peculiar, particularly in light of the officers testimony at trial that the terminal was small. III R. at 33–34. Occasionally they were "looking around" and looking over their shoulders. III R. at 13,

---

1. Bell's decision to surrender his package to the officers was not voluntary. Originally, Bell told officer Steed that he did not want him to inspect the package. III R. at 43. Officer Steed then summoned officer Whittaker. III R. at 52. In response to Bell's inquiries about whether the officers could legally detain his package and subject it to a dog sniff, officer Whittaker told Bell that they could. III R. at 16–17. Officer Whittaker told Bell he could either surrender the package in exchange for a receipt, or accompany it to the terminal. III R. at 17. Because Bell reasonably believed he had no choice but to comply at this point, his consent to the seizure was not voluntary. *See United States v. Recalde*, 761 F.2d 1448, 1453–54 (10th Cir.1985). Although Bell retained physical possession of his package while walking to the terminal, the actu-

al seizure occurred in the parking lot once the officers announced their intention to take control of the package.

2. Our review of the district court's ultimate conclusion that there was reasonable suspicion to seize the package is a *de novo* review. "Whether reasonable suspicion ... exists to justify a seizure is a mixed question of fact and law. The findings with respect to the historical facts are reviewed under the clearly erroneous standard; the ultimate conclusion, however is subject to *de novo* review." *United States v. Campbell*, 843 F.2d 1089, 1092 (8th Cir.1988); *People of the Territory of Guam v. Ichiyasu*, 838 F.2d 353, 355 (9th Cir.1988) (same).

40. Because that type of conduct is commonly observed at airports, it cannot fairly be considered suspicious.

Officer Whittaker then testified that while following the defendants toward the parking lot, "Mr. Bell turned around and noticed us walking up behind them. At that time he held back from Mr. Ziebarth, about five, ten feet behind him, and then turned and started walking to the east, as we had passed Mr. Bell and actually approached Mr. Ziebarth." III R. at 14–15. Given the numerous imaginable reasons why two people might separate and walk in opposite directions in an airport parking lot, *see United States v. Sokolow,* —— U.S. ——, 109 S.Ct. 1581, 1586, 104 L.Ed.2d 1 (1989), it troubles me to attribute wrongful motive to this type of conduct simply because officer Whittaker testified that Bell did this after "noticing" the officers following them. There was no testimony that the defendants ran, quickened their pace, or otherwise attempted to flee. *Cf., Florida v. Rodriguez,* 469 U.S. 1, 3–5, 105 S.Ct. 308, 309–10, 83 L.Ed.2d 165 (1984) (reasonable, "articulable suspicion" based in part on defendant's unsuccessful attempt to run). Characterizing such behavior as "suspect" will in too many cases permit a finding of a "reasonable, articulable suspicion" of criminal activity based only on the subjective beliefs of an investigating officer.

Reliance on officer Steed's testimony concerning Bell's "nervousness" and increased breathing raises the same problem. III R. at 51–52. Such a characterization is too dependent on the subjective perceptions or "hunches" that may be colored by the subsequent investigation. That, combined with the fact that it is natural to display some degree of perceptible nervousness when one is stopped and questioned by a police officer, convinces me that this cannot be cast as the type of behavior giving rise to a "reasonable, articulable suspicion."

For me, the critical distinction between the detention of Ziebarth and the seizure of Bell's package is their respective responses to the officers' questions. Although Ziebarth made a false representation to the officers about a matter material to the suspected criminal activity, Bell did not. Ziebarth told officers Palmer and Whittaker that he did not have large amounts of money, but he later acknowledged to officer Palmer that he was carrying about $7,000 in cash.[3] II R. at 41. Although Ziebarth insisted this was not a lot of money for him, by reasonable standards it was a large sum. This additional fact,[4] when added to the other facts, did give officer Palmer a "reasonable, articulable suspicion based on objective facts" that Zeibarth was engaged in criminal activity justifying his detention.[5]

By contrast, Bell did not make inconsistent or demonstrably untrue statements to the police officers before his package was seized. Officer Steed asked Bell if he was a friend of the "other gentleman", while pointing at Ziebarth. Bell said no. Officer Steed then asked Bell, "Aren't you a friend of his, aren't you with him or a friend of his?" Bell said "not really." III R. at 50. This was not the kind of material misrepresentation that Ziebarth made. Given the ambiguity of officer Steed's second question, Bell's two responses do not directly contradict one another.[6] Moreover, the of-

---

3. Because officer Whittaker had departed from the Ziebarth interrogation prior to the discovery of the $7,000, Ziebarth's misrepresentation cannot be aggregated with Bell's own conduct for purposes of determining whether agents Whittaker and Steed had a "reasonable, articulable suspicion" justifying the seizure of Bell's package. II R. at 30.

4. While the mere possession of large sums of cash alone might not suggest criminal activity, Ziebarth had been informed that he was being questioned as part of a narcotics investigation. Therefore, at the time he made the misstatement of fact to the officers he was on notice

that it was related to the suspected criminal activity.

5. *See United States v. Cooper,* 873 F.2d 269, 275 (11th Cir.), *cert. denied,* —— U.S. ——, 110 S.Ct. 118, 107 L.Ed.2d 79 (1989). (Fact that defendant lied to officer about the number of pieces of luggage she was traveling with contributed to reasonable suspicion that defendant's luggage contained narcotics).

6. Officer Whittaker testified that while escorting Bell from the parking lot back to the terminal building, Bell told him that Ziebarth "was an old friend." III R. at 18. This statement does

ficers had no objective evidence that either statement was false.

Finally, officer Steed testified that Bell was turning his right shoulder in an attempt to hide the jacket that was covering the package. Once again, resting a finding of a "reasonable, articulable suspicion" on this type of conduct is too dependent on the subjective characterizations of an investigating officer. A harmless readjustment of a jacket can become a furtive attempt to conceal when viewed with the benefit of hindsight.

I recognize that the majority considered all of those facts together, rather than in isolation, in concluding that there was a "reasonable, articulable suspicion" justifying the seizure of Bell's package. However, even considered as a whole, I do not see that Bell's behavior was any different from that of thousands of other travelers

who pass daily through air terminals. Likewise, his responses and behavior upon being confronted by the police officers was no different from that which could reasonably be expected of a law abiding citizen. Thus, I do not believe that the government established grounds for a "reasonable, articulable suspicion" that Bell was engaged in criminal activity at the time his package was seized.

I have not found any cases holding that there was a "reasonable, articulable suspicion" sufficient to justify an investigative seizure based on facts as neutral as those involved in Bell's case.[7] To the contrary, as the cases cited by the majority suggest, a "reasonable, articulable suspicion" is typically based on behavior far more suggestive of criminal activity than that present here.[8] Therefore, I respectfully dissent

---

contradict Bell's first statement to officer Steed denying that Ziebarth was a friend of his. However, because Bell made that statement after the officers seized the package, it cannot be considered in deciding whether there was a "reasonable, articulable suspicion" justifying the seizure.

7. See *United States v. Gooding*, 695 F.2d 78, 82–84 (4th Cir.1982), and *United States v. Jefferson*, 650 F.2d 854, 856–58 (6th Cir.1981), where seizures were invalidated upon facts similar to those here.

8. The majority relies primarily on *United States v. Sokolow*, —— U.S. ——, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989). In *Sokolow*, the defendant paid for two round-trip tickets costing $2,100 in twenty-dollar bills in order to travel from Hawaii to Miami, a source city for illegal drugs, in July. *Id.* 109 S.Ct. at 1586. Sokolow traveled twenty hours round trip, with only carry-on luggage, and spent a mere forty-eight hours in Miami. *Id.* Sokolow appeared nervous and was apparently traveling under an alias. *Id.* The Supreme Court stated that Sokolow's cash purchase of a ticket, and his travel from Honolulu to Miami for such a short stay were both "out of the ordinary." *Id.* at 1586. The *Sokolow* Court held that these factors, in conjunction with Sokolow's other more neutral conduct, supported a "reasonable suspicion." *Id.* Because I do not find any of Bell's behavior "out of the ordinary", I conclude that Sokolow's course of conduct is much more suspicious than the observed actions of Bell.

The majority also relies on *United States v. Place*, 462 U.S. 696, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983). *Place* was the first case in which

the Supreme Court specifically extended the "reasonable, articulable suspicion" standard of *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), to brief, investigative seizures of a traveler's luggage. *Id.* 462 U.S. at 706, 103 S.Ct. at 2644. However, the *Place* Court found the seizure there to be unreasonable because of the length of the detention without ever discussing whether the investigating officers had a "reasonable, articulable suspicion" that Place's luggage contained narcotics. *See id.* at 708–10, 103 S.Ct. at 2645–46. Therefore, I do not believe that *Place* can be relied on to conclude that officers Whittaker and Steed had a "reasonable, articulable suspicion" that Bell's package contained either narcotics or cash for the purchase of narcotics. Moreover, even if *Place* is read as implicitly recognizing a "reasonable, articulable suspicion", I believe Place's actions in listing fake addresses on the tags to his checked luggage is more suspicious than Bell's apparently innocent activities. *Id.* at 698, 103 S.Ct. at 2639.

Finally, the majority relies on *United States v. Stone*, 866 F.2d 359 (10th Cir.1989). In *Stone*, this court held that the officer who stopped Stone for speeding had a reasonable suspicion justifying detention of the car for inspection by a narcotics dog. *Id.* at 362. The officer knew that Stone had been stopped earlier and that a fragrant oil commonly used to mask the smell of narcotics had been discovered. *Id.* at 361–62. Second, the officer knew that a DEA computer had indicated that Stone was suspected of drug involvement and was associated with known drug dealers. *Id.* at 362. Again, the facts in Stone were more suggestive of criminal activity than those leading up to the seizure of Bell's package.

from the majority's decision affirming the denial of Bell's suppression motion.