UNITED STATES of America,
Plaintiff–Appellee,

v.

Gwendolyn Joyce COOPER, Antonio Charles Blow, Defendants–Appellants.

UNITED STATES of America,
Plaintiff–Appellant,

v.

Jackie HUNTER, a/k/a Larry Scott, Defendant–Appellee.

Nos. 88–8139, 88–8248.

United States Court of Appeals, Eleventh Circuit.

May 17, 1989.

---

Patrick G. Longhi, Atlanta, Ga. (Court–Appointed), for Cooper.

Suzanne Hashimi, Federal Defender Program, Inc., Atlanta, Ga., for Blow.

Glenn Zell, Atlanta, Ga. (Court–Appointed), for Hunter.

Robert F. Schroeder, Asst. U.S. Atty., Atlanta, Ga., for U.S.

Before ANDERSON and EDMONDSON, Circuit Judges, and ESCHBACH *, Senior Circuit Judge.

PER CURIAM:

A jury found defendants, Gwendolyn Cooper, Jackie Hunter, and Antonio Blow guilty of possession of cocaine with intent to distribute and conspiracy to possess cocaine with intent to distribute, in violation of 21 U.S.C. sections 841(a)(1), 846 and 18 U.S.C. section 2. Defendant Blow was also found guilty of possession of cocaine in violation of 21 U.S.C. section 844. The district court granted defendant Hunter's motion for a judgment of acquittal. We reverse the judgment of acquittal for Hunter and affirm the convictions of Cooper and Blow.

*Background*

At the Atlanta airport, DEA agents watched two males (later determined to be Blow and Hunter) deplane from an incoming Miami flight. The two men pretended to arrive separately and yet acted in some ways as if they were together. The agents saw the name Larry Scott on one man's ticket and researched the airline's reservation record. One-way reservations were made that morning in the names of Larry and James Scott. DEA agent Paul Markonni observed that the two looked unlike brothers.

Blow and Hunter walked down the concourse separately, both looking over their shoulders. After fifty or seventy-five feet they joined and continued up the concourse together. Based on their experience, the DEA agents knew that people who are making last minute trips from known drug source cities and people who are unusually nervous at the airport indicate that a drug investigation should be conducted. The agents decided to interview the two men and followed Blow into the men's restroom. Blow told them he was traveling alone, but Hunter passed by and told Blow that a boarding pass was waiting for him. Blow acted very nervous and the agent asked if he could search Blow's person and knapsack. Although the search revealed nothing, Blow dropped a folded dollar bill that contained cocaine. Blow was arrested and searched further. The agents found more cocaine, along with a roll of masking tape [1] and boarding passes in the names of L. Scott and J. Scott, the name under which Hunter was traveling.

Meanwhile, other agents had interviewed Hunter. Although his ticket was in the name of Scott, Hunter stated that his name was Hunter. Hunter consented to a search of his clothes bag and person, but the agent found no contraband. Hunter said he was traveling with a friend and was told that the friend had been arrested on a cocaine charge. Hunter got directions to the jail where Blow was taken and left the concourse.

The agents believed that, because the men were traveling under false names and apparently were pretending not to be together, there was more to the situation than met the eye; they checked the pertinent flight list to see if there were other passengers with the same Miami–Atlanta–Richmond itinerary as Blow and Hunter. The agents found that Gwendolyn Cooper

---

* Honorable Jesse E. Eschbach, Senior U.S. Circuit Judge for the Seventh Circuit, sitting by designation.

1. In the experience of drug agents, masking tape is commonly used by drug traffickers to package large quantities of cocaine.

was the one other passenger with the same itinerary, that she had made her reservations four minutes before the two men, and that her ticket, like those of the two men, was purchased in cash. The agents checked and found that the only two bags on the Miami–Atlanta–Richmond flight belonged to Cooper. The Richmond flight was boarding as the DEA men approached to interview Cooper. After some questions, the agents asked to search her bags which she was not carrying on the plane. Cooper first said she only had one bag then changed her story to say she had a bag and a box. In reality, Cooper had a tote bag and a folding clothes bag. Cooper acted very nervous and refused to consent to a search of her luggage.

Cooper boarded the plane, and the agents proceeded to check the call-back number on her reservation record. The number was the Hampton Inn, and while there was no record that Cooper stayed there, Hunter had been registered there the previous evening. Agent Markonni called Richmond and was told that the DEA agent there was unsure that he could get a narcotic detector dog to the Richmond airport before Cooper's flight landed. Without notice to Cooper, Markonni removed Cooper's luggage from the airliner and detained the luggage in Atlanta. He testified that there was no way that Cooper could have seen him taking the bags off the plane. Cooper's plane left Atlanta. A narcotic detector dog was sent for and, approximately thirty-five minutes later, the dog alerted to Cooper's luggage. Agent Markonni applied for a search warrant.

Meanwhile, a drug enforcement agent in Richmond watched Cooper deplane and place a telephone call. She left the airport without attempting to claim her luggage. When an agent approached Cooper and questioned her, she denied having any luggage; and she no longer had the baggage claim checks stapled to her ticket folder.

Back in Atlanta, about one-half kilogram of cocaine was found in a taped package in Cooper's luggage. Cooper was arrested in Richmond.

## The Judgment of Acquittal

■ Judge Tidwell's order granting Hunter judgment of acquittal stated that there was insufficient evidence presented to the jury to authorize a guilty verdict. The government contends that the district court erred in granting Hunter's judgment of acquittal because the government presented sufficient evidence to establish beyond a reasonable doubt that Hunter knowingly possessed cocaine with intent to distribute and conspired to possess cocaine with intent to distribute. In our assessment of the evidence, we are not required to exclude every reasonable hypothesis of innocence or to find the evidence wholly inconsistent with every conclusion except that of guilt, "provided a reasonable trier of fact could establish the defendant's guilt beyond a reasonable doubt." *United States v. Holmes*, 838 F.2d 1175, 1176 (11th Cir.1988) (citing *United States v. Rosenthal*, 793 F.2d 1214, 1225 (11th Cir.1986)), *cert. denied*, —— U.S. ——, 108 S.Ct. 2829, 100 L.Ed.2d 930 (1988). "A jury is free to choose among reasonable constructions of evidence." *Id.* "[W]e view the evidence in the light most favorable to the government and accept reasonable inferences and credibility choices by the factfinder." *Id.* at 1176–77 (citation omitted).

■ With respect to the conspiracy charge, the government must prove that defendant knowingly participated in a criminal conspiracy. *United States v. Blasco*, 702 F.2d 1315, 1330 (11th Cir.1983). A conspiracy may be inferred from a concert of action or from a development and collection of circumstances. *United States v. Rodriguez–Arevalo*, 734 F.2d 612, 615 (11th Cir.1984). Participation in a conspiracy can be inferred from evidence that the defendant took action that furthered the conspiracy, and the defendant's own statements may be used to infer his participation in a conspiracy. *United States v. Vera*, 701 F.2d 1349, 1357 (11th Cir.1983); *United States v. Hewitt*, 663 F.2d 1381, 1388 (11th Cir.1981).

■ To sustain a conviction for possession with intent to distribute cocaine, there is no requirement that the government

present evidence that Hunter was ever in actual or constructive possession of the cocaine; the government need only present sufficient evidence to allow the jury to find beyond a reasonable doubt that Hunter was guilty of aiding and abetting Blow and Cooper in their possession with intent to distribute cocaine. *See United States v. Musser,* 856 F.2d 1484, 1485 (11th Cir. 1988), *cert. denied,* —— U.S. ——, 109 S.Ct. 1145, 103 L.Ed.2d 205 (1989). We hold that the government presented sufficient evidence in this case for a reasonable jury to find that Hunter possessed cocaine with intent to distribute and conspired to possess cocaine with intent to distribute.

The evidence established that defendant Hunter was traveling with co-defendant Blow, both under a one-way cash ticket from Miami to Atlanta to Richmond. When the men deplaned in Atlanta, they continually looked back in the direction of the arrival gate. The men initially acted as if they were traveling separately, although it later became clear that they were traveling together. Each gave a different explanation of why he had a travel companion.

Blow denied traveling with anyone, even though the agents observed Hunter approach Blow and inform Blow that Hunter had reserved a seat for Blow on the continuing flight. When Hunter was approached, he admitted to traveling with his friend, referring to Blow, and also expressed great interest in Blow's arrest and how arrangements could be made to have Blow released from custody. When Blow was arrested and searched, agents found him in possession of Hunter's used boarding pass in the name of "Larry Scott," as well as two airline boarding passes in the names of "J. Woods and L. Woods."

Agents also found Blow in possession of masking tape that was later scientifically analyzed and determined to have been used to package the cocaine that was found in co-defendant Cooper's bag. After Hunter was questioned by law enforcement agents, he then left the airport without retrieving his airline ticket to Richmond, Virginia. In addition, the cocaine that was found in co-defendant Cooper's bag was of an ex-tremely high quality and was very similar to two of the three packages of cocaine taken from Blow's person.

The evidence also demonstrated that one day earlier Hunter had a reservation for a party of two at the Hampton Inn, Miami Springs, Florida, and at least one of the people there with him was Blow. Hotel records from Hunter's room revealed that long distance telephone calls were made to both Hunter's and Blow's homes in Portsmouth, Virginia.

Aside from Hunter's connection to Blow, there is a direct connection between Hunter and the cocaine found in Cooper's bag. Cooper testified that she had been introduced to Blow by Hunter. The evidence at trial established that Cooper had the same one-way cash travel itinerary as Hunter and Blow and that her airline reservations were made that morning, four minutes before Hunter and Blow's reservations were made. It was later determined that Cooper's airline ticket was sequentially numbered to both Hunter and Blow's airline tickets, indicating that these tickets were picked up at approximately the same time. In addition, the home telephone contact number listed by Cooper on her airline reservations was the phone number of the Hampton Inn, Miami Springs, Florida. When this number was contacted, agents learned that Cooper had no reservation at the Hampton Inn, although there was a reservation in the name of Jackie Hunter.

When Cooper exited from the plane in Richmond, Virginia, she made a telephone call and hung up the phone after hearing a page for "Glenn Cooper." Cooper testified that she spoke to Hunter by telephone and that Hunter told her not to claim her luggage; Cooper then left the airport without even attempting to retrieve her luggage. A law enforcement agent confronted Cooper, and she gave answers which were contradictory to information she earlier had given in Atlanta.

The day after Cooper was arrested, her pocketbook was searched and found to contain an airline ticket and boarding pass for a one-way cash travel the day before from Atlanta to Miami. When this airline travel

record was examined, it was discovered that although Cooper had originally made the reservation, a person who identified himself as "Mr. Hunter" changed the ticket to a later flight. Cooper also had in her pocketbook an address book with Hunter's name and phone number, a Rolodex card with Hunter's name, address and phone number, and a business card from the Hampton Inn.

In short, a jury could easily conclude that Hunter was the link between Blow, from whom the smaller quantity of cocaine was taken, and Cooper, from whose suitcase the one-half kilogram of cocaine was taken. The evidence also tied the cocaine possessed by Blow with that possessed by Cooper. From this evidence the jury could reasonably conclude that Hunter knew what Cooper and Blow were doing and was assisting them. We have observed before that it is reasonable for a jury to conclude that "a prudent drug trafficker is not likely to suffer the presence of unaffiliated bystanders." *United States v. Cruz–Valdez,* 773 F.2d 1541, 1547 (11th Cir.1985). Based upon the reasonable inferences that could be drawn from Cooper, Hunter and Blow's actions, there was sufficient evidence to support the jury's verdict against Hunter.

*The Luggage Seizure*

■ Appellant Cooper contends that the detention of her luggage at Hartsfield International Airport was an illegal seizure. She argues that detention of her luggage was unsupported by reasonable suspicion and was for an unreasonable amount of time.[2] We disagree.

In *United States v. Place,* 462 U.S. 696, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983), the Supreme Court extended the scope of the Terry stop[3] to luggage. The *Place* court stated "when the nature and extent of the detention are minimally intrusive of the individual's Fourth Amendment interests,

the opposing law enforcement interests can support a seizure on less than probable cause." *Place,* 462 U.S. at 703, 103 S.Ct. at 2642. "Even though such a detention restricts the possessor's freedom of movement, the seizure is permissible if the police possess a reasonable, articulable suspicion, in view of the totality of the circumstances, that the luggage contains contraband or evidence of a crime." *United States v. Puglisi,* 723 F.2d 779, 786 (11th Cir.1984). Reasonable suspicion is defined as "specific and articulable facts which taken together with rational inferences from those facts, reasonably warrant [an] intrusion." *United States v. Espinosa–Guerra,* 805 F.2d 1502, 1508 (11th Cir.1986) (quoting *Terry v. Ohio,* 392 U.S. 1, 21, 88 S.Ct. 1868, 1879, 20 L.Ed.2d 889 (1968)).

At the time the agent in this case directed the luggage to be removed from the aircraft baggage bin, he had sufficient facts from which he could have formed a reasonable suspicion that Cooper was carrying narcotics. When agents seized Cooper's luggage, they knew the following facts and circumstances regarding Cooper's travel and behavior: (1) Cooper was the only other passenger on the flight from Miami with the same travel itinerary as Hunter and Blow, who had been found in possession of cocaine; (2) Miami, Florida is a significant drug distribution city for the entire United States; (3) Cooper was traveling on a one-way cash ticket, as were Blow and Hunter; (4) Cooper's reservations were made that morning, four minutes before the reservations for Blow and Hunter; (5) Blow was found in possession of masking tape although neither Blow nor Hunter was in possession of a significant amount of contraband, indicating that another person traveling with them had narcotics; (6) the only two bags that were connecting between the inbound Miami flight and the outbound Richmond flight were of Coo-

2. No one here has argued that some higher standard than reasonable suspicion, such as probable cause, must be met before a traveler's bags may be—without notice to the traveler—seized and removed from a departing airplane upon which the traveler is a passenger. This is a substantial question; but we do not address it today.

3. *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), permits a forcible seizure and pat down of a suspect for weapons, if the police officer has a reasonable, articulable suspicion that criminal activity is afoot.

per's; (7) Cooper appeared extremely nervous during the course of her interview with Markonni; (8) Cooper produced identification indicating that she lived in College Park, Georgia, yet claimed that she was traveling for pleasure from Atlanta to Richmond via Miami; (9) Cooper lied to Markonni and originally stated that she had only one bag, even though Markonni saw Cooper in possession of two baggage claim stubs [4]; and (10) when Markonni called the telephone number listed on Cooper's reservations record, he learned that he was calling the Hampton Inn in Miami Springs, Florida, which is a hotel located outside the Miami International Airport. Markonni further learned that Cooper had no reservation at the hotel, although Hunter had registered at the hotel as a party of two people in one room. These facts were sufficient to particularize the agent's suspicion. *See United States v. Berry*, 670 F.2d 583, 601 (5th Cir. Unit B 1982) (en banc).

■ We now address whether the detention of Cooper's luggage for thirty-five minutes before the narcotic detection dog alerted was reasonable.[5] The brevity of the invasion of the individual's fourth amendment rights is "an important factor in determining whether the seizure is so minimally intrusive as to be justifiable on reasonable suspicion." *Place*, 462 U.S. at 709, 103 S.Ct. at 2645. Another important factor to consider in assessing the effect of the length of detention is whether the po-

lice diligently pursued their investigation. *Id.*

We accept that the law enforcement officials diligently pursued their investigation, exhibiting the special "duty of diligence" deemed so important by the *Puglisi* court. *See Puglisi*, 723 F.2d at 790. Before seizing Cooper's luggage, special agent Markonni called the DEA in Richmond and learned that they were unsure if they could get a narcotic detector dog to the Richmond airport before Cooper's flight was scheduled to land. Markonni, unwilling to allow potential drug activity to go undetected, felt he had no good choice but to seize the luggage in Atlanta. He then promptly called the Clayton County Police Department. The police officer and the narcotic detector dog arrived at the airport thirty minutes from the time Markonni removed the luggage from the departing plane. The dog alerted to Cooper's luggage five minutes later, and Markonni brought the luggage to the U.S. Courthouse and obtained a search warrant. We are unwilling to hold that police must have a dog on site at the airport at all times, ready to sniff at a moment's notice. *See United States v. Alpert*, 816 F.2d 958, 964 (4th Cir.1987) (refusing to impose per se rule requiring that narcotics dogs be kept at each airport where *Terry* stops are used in interdiction of drug traffic); *United States v. Borys*, 766 F.2d 304, 314 (7th Cir.1985) (no requirement for agents to have dog immediately available, only readi-

---

**4.** Cooper eventually stated that she had additional clothes, first claiming that the clothes were in a box and finally admitting that they were in a blue clothes bag.

**5.** The parties characterize the seizure as one of, at most, 35 minutes and advance no claims of inconvenience beyond this detention. No one has argued that the seizure should be viewed as one for a longer time; but it seems arguable that—regardless of the outcome of the police investigation—once the bags were removed from Cooper's flight, the bags would have to follow by a later flight and would not have even started on their delayed trip until sometime after the police had satisfied themselves about the presence of drugs in the bags. We suspect (we have been directed to no evidence on point) that, at the time the bags were first seized, the length of time the passenger could be expected to be dispossessed of luggage under these cir-

cumstances would be hours and that this seizure would inherently be more than minimally disruptive. *United States v. Place*, 462 U.S. at 696, 103 S.Ct. at 2637, held a ninety minute seizure to be unconstitutional.

We avoid ruling on arguments not presented to us, but we are troubled by the notion that a traveler may arrive at a distant destination with only the clothes on his back to find that his luggage has been seized at take-off. The seizure in this case was without notice to Cooper; she had no chance to choose to stay with her bags. This kind of luggage seizure could potentially be more than just aggravating: for instance, travelers with medical problems might leave important and legitimate medication in their baggage and be unable to function at their destination without it. Taking bags from departing flights without notice to the passenger is a questionable practice.

ly available); *United States v. West,* 731 F.2d 90, 92 (1st Cir.1984) (no requirement for DEA agents to "have a dog waiting near the gate whenever a sniff test of a known suspect's baggage is either probable or possible").

Appellants have cited no cases which hold that a detention of thirty-five minutes or less is unreasonable. *But see Borys,* 766 F.2d at 304 (seventy five minute detention of luggage lies within outer bounds of what fourth amendment allows); *State v. Jerome,* 736 P.2d 438 (Hawaii 1987) (thirty minute delay bringing dog to area reasonable). The record indicates that Markonni acted both diligently in calling the Richmond DEA and promptly in calling the Clayton County Police Department. *Cf. United States v. Hardy,* 855 F.2d 753 (11th Cir.1988) (in upholding fifty minute detention, court stressed expedition with which police arranged for narcotics dog), *cert. denied,* — U.S. —, 109 S.Ct. 1137, 103 L.Ed.2d 198 (1989).

We weigh the police diligence here in the "required balance between the public's interest in effective crime investigation and the interest of the traveler in proceeding unimpeded through the airport." *Puglisi,* 723 F.2d at 790. We also note in our equation that no one seized the luggage from the suspect's person or in a way to cause embarrassment; for good or for bad, Cooper apparently never knew the luggage had been taken and never went to claim it upon learning of Blow's arrest in Atlanta. *See id.* at 788. We therefore hold that in the light of the arguments presented, the police diligence, and the apparent lack of alternatives open to the police in conducting the investigation, the seizure and detention of Cooper's luggage was reasonable.[6] The district court correctly denied Cooper's motion to suppress.

Accordingly, we REVERSE the judgment of acquittal for Hunter and AFFIRM the convictions of Cooper and Blow.

---

6. We conclude that the other claims raised by appellants are meritless.