[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
Nov. 17, 2009
THOMAS K. KAHN
CLERK

_____

No. 08-14666
Non-Argument Calendar

_____

D. C. Docket No. 07-20338-CR-PAS

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

DWIGHTE MORLEY,
EUGENE RUSSELL,

Defendants-Appellants.

_____

Appeals from the United States District Court
for the Southern District of Florida

_____

(November 17, 2009)

Before BIRCH, CARNES and WILSON, Circuit Judges.

PER CURIAM:

Dwighte Morley and Eugene Russell appeal their convictions for conspiracy to import 100 kilograms or more of marijuana, importation of 100 kilograms or more of marijuana, conspiracy to possess with intent to distribute 100 kilograms or more of marijuana, and possession with intent to distribute 100 kilograms or more of marijuana. On appeal, Morley contends (1) that the evidence was insufficient to establish his participation in either the conspiracies or the substantive offenses; and (2) that the district court abused its discretion in denying his motion to sever his trial from that of Russell. Russell argues (1) that the district court abused its discretion in instructing the jury that it was permitted to consider his flight as evidence of his guilt, and (2) that his trial counsel rendered ineffective assistance. After careful review of the record and the parties' briefs, we discern no error and AFFIRM.

## I. BACKGROUND

In October 2006, agents with the Drug Enforcement Agency ("DEA") began investigating Morley and Russell after receiving information from a confidential source that they were arranging to smuggle drugs into the United States from Bimini, Bahamas. R4 at 60, 62. Extensive surveillance on Russell and his associates conducted by DEA agents and officers with the U.S. Immigration and Customs Enforcement ("ICE"), U.S. Customs and Border Protection ("CBP"), and

2

City of Miami Police Department ("MPD"), led law enforcement to believe that the drugs were going to be carried from the Bahamas on a boat belonging to Phillip Taylor and offloaded in the Coconut Grove area of Miami at a location on Royal Road, which dead-ends at the Biscayne Bay seawall. Id. at 62-71; see also R6 at 43-44, 46-48, 64-66, 70-75, 122-29; R8 at 7-14. As a result of the DEA investigation, Dwighte Morley, Eugene Russell, and Morley's twin brother, Derrick Morley ("Derrick"),[1] were charged in a four-count indictment with: (1) conspiracy to import 100 kilograms or more of marijuana into the United States, in violation of 21 U.S.C. §§ 952(a), 963, 960(b)(2) (Count One); (2) knowingly and intentionally importing 100 kilograms or more of marijuana into the United States, in violation of 21 U.S.C. §§ 952(a), 960(b)(2), 18 U.S.C. § 2 (Count Two); (3) conspiracy to possess with intent to distribute 100 kilograms or more of marijuana, in violation of 21 U.S.C. §§ 846, 841(a)(1), (b)(1)(B) (Count Three); and (4) knowingly and intentionally possessing with intent to distribute 100 kilograms or more of marijuana, in violation of 21 U.S.C. § 841(a)(1), (b)(1)(B), 18 U.S.C. § 2 (Count Four). R1-1.

Morley and Russell's co-conspirators, Delton Edward Cash, Lamardo King, Freedman Robins, Rocky Saunders, and Taylor, were charged in a separate four-

---

[1] Derrick Morley pled guilty to Count One pursuant to a written plea agreement. See CM/ECF, S.D. Fla., Case No. 1:07-cr-20338, Docs. 93, 94, 95, 136.

3

count indictment with conspiracy to import and importation of cocaine and conspiracy to possess with intent to distribute and possession with intent to distribute marijuana. Cash, King, Robins, and Saunders all pled guilty to the conspiracy to import count. Cash and King were sentenced to thirty months of imprisonment, while Robins and Saunders both were sentenced to thirty-seven months of imprisonment. Taylor, who went to trial and was found guilty by a jury on all four counts of the indictment, was sentenced to ninety-six months of imprisonment.

At trial, Cash testified to the following. At around 4:00 or 5:00 P.M. on 23 January 2007, he drove from Fort Lauderdale to a residence in Miami, where he met Taylor and the Morley twins. R8 at 84-86. Cash explained that he did not know the twins by name, but would be able to tell them apart if he saw them "standing both by each other" because "one was a little bigger than the other one." Id. at 86, 93. Cash thus referred to the Morley twins as "Big Twin and Little Twin," and identified Morley as "Big Twin." Id. at 86, 88. During their meeting, Little Twin told Cash that "they needed [his] help to go pick up something." Id. at 86. Big Twin then called King, who, along with King's cousin, arrived half an hour later in a burgundy-colored cargo van. Id. at 88-89; see also R4 at 71-73. The group decided that King would drop off his cousin and they would meet at

4

another location to further discuss their plans. R8 at 89-90. Cash and Big Twin followed King to King's cousin's house, while Taylor and the "small twin" drove in Morley's Mercury Sable. Id. at 90; see R4 at 75. Taylor and the "small twin" were already at King's cousin's house when Cash and Big Twin arrived, and King and his cousin were removing items from the van. R8 at 90-91. Cash remained in the vehicle while Big Twin went to speak with Taylor and Little Twin. Id. at 91. Big Twin returned to Cash's car and told Cash that "it [was] time to go." Id. Cash and Big Twin then drove to Big Twin's house so Big Twin could change into dark clothes. King followed. Id. at 91. Cash waited in the car, smoking marijuana, while Big Twin went inside. Id. at 91-92. When Big Twin came back outside, he was wearing different clothes and carrying two fishing rods. Id. at 92. Big Twin then said, "we have to go, it is time to go in the Grove, time to go in the hole." Id. at 92. Cash explained that "the hole" meant the offload site where they were going to meet the boat and pick up the drugs. Id.

Cash testified that before they departed for the offload site, Big Twin told him to drive in the van with King because he, Big Twin, was going to pick up Russell in Cash's car after the drugs were offloaded. Id. at 92, 94. Big Twin also explained that Little Twin was "going to be on top and be the lookout," and Taylor was going to haul the boat trailer to pick up the boat. Id. at 92. Cash then got in

5

the van with King and they started making their way toward Coconut Grove. Id. at 94. During the drive, Cash learned that King did not have a Florida driver's license and became concerned that if they were to be pulled over, the police could arrest King and search the van. Id. at 94-95. Cash called Big Twin, who was driving Cash's car, and told him to call off the plan. Id. at 95. Big Twin agreed that they would pull over at a gas station, Cash would park his car, and Big Twin would drive the van to the offload site. Id. at 95-96.

According to Cash, he, King, and Big Twin arrived at the hole around 9:00 P.M. Id. at 97; see also R6 at 66, 70-71. Big Twin and King removed the fishing rods from the van and pretended to fish. R8 at 96-97. After spotting a vehicle on the dead-end road, Cash called the "small twin" and "asked him if he [was] on top watching out[,] if everything looked good up there." Id. at 97-98. Little Twin responded, "yes, everything look[s] good, don't worry about nothing." Id. at 98. Shortly thereafter, Cash received word from Taylor, who was waiting by the marina, that the boat was close to shore. Id. at 98.

Cash testified that Russell, Saunders, and Robins were aboard the boat when it pulled up to the seawall. Id. at 99-100; see R10 at 63-65. Saunders testified later that Cash, King, and Derrick were waiting when they arrived at the offload site. R10 at 68. According to Saunders, although Derrick and Morley were identical

6

twins, Derrick was the bigger of the two. Id. at 54-55. Saunders stated that he expected Morley, Derrick, and Cash "to pick up the weed at the time," but he never saw Morley at the offload site that night. Id. at 70, 86, 88. When he asked where Morley was, Saunders was told that Morley was "up top." Id. at 70, 88. Saunders explained that "up top" meant Morley was "looking out" from the far end of the road, away from the offload site. Id. at 88-89.

Cash further testified that once the boat arrived, Big Twin/Dwighte backed the van up to the seawall. R8 at 100. Cash, King, and Big Twin began offloading bags and boxes from the boat and placing them into the rear cargo area of the van. Id. According to Saunders, it was he, Cash, King, Robins, and Derrick Morley who offloaded the marijuana. R10 at 68-69. Both Saunders and Cash testified that after the men finished offloading the parcels, Russell stayed in the boat and the rest of them got into the van and started traveling west on Royal Road. Id. at 69; R8 at 100. Saunders testified that Derrick was driving the van. R10 at 69.

DEA Special Agent John Bleier, who arrived at the west-end of Royal Road at approximately 10:00 P.M. on 23 January, testified that about ten or fifteen minutes after he established surveillance of the area, he observed the burgundy van driving west on Royal Road as he was driving east towards the offload site. R6 at 122-124, 126-27. He activated his police lights when he was approximately 150

7

to 200 feet from the van, in "well-enough time for the van to see [him] coming down the road." Id. at 128. Once the van got close enough to see Bleier's police lights, it started swerving and collided with his police vehicle. Id. at 127-28. When the vehicles came to a stop, the occupants of the van fled on foot. Id. at 129; see also R8 at 101; R10 at 70. A subsequent search of the van uncovered approximately 300 kilograms of marijuana. R6 at 129-30, 135.

MPD detective David Valentin, who established surveillance of Royal Road between 8:00 and 9:00 P.M. and observed the offloading operation, testified that about fifteen or twenty seconds after the van left the offload area, which would have been the time immediately following the van's collision with Bleier's police vehicle, the driver of the boat "put the . . . pedal to the metal and took off." Id. at 64-65, 70-74, 76, 117. Detective Valentin testified that when the boat was moving slowly, he was about five feet from the shoreline and could see that only one individual, the boat's driver, was on board. Id. at 75. He could not see the driver's face, but could tell that the driver was a heavyset black male. Id. Detective Valentin testified that he was able to read the boat registration number, FL0235MM, which he called in via radio. Id. Special Agent Jiries Salameh had previously testified that this boat was registered to Taylor. R4 at 65-66, 69.

During his cross-examination of Detective Valentin, Neil Nameroff,

Russell's trial counsel, asked Detective Valentin, "Isn't it true that after this incident you were shown a photograph of Eugene Russell?" R6 at 88. When Detective Valentin stated that he "[did]n't recall that," Nameroff again asked him, "Isn't it true that after this incident you were shown a photograph of Eugene Russell and you said that was not the man?" Id. at 88-89. Counsel for the government then objected to Nameroff's question for lack of basis. Id. at 89. The district court instructed Nameroff to proffer a basis for the question and advised him that if he had no basis for asking the question, then the question was improper. Id. At side-bar, the following exchange took place:

| | |
|---|---|
| Nameroff: | I was told, Your Honor – |
| The Court: | You need to whisper. |
| Nameroff: | I was told, Your Honor. |
| The Court: | Who told you? |
| Nameroff: | By Miss Waugh [government's counsel] that witnesses of this incident were shown photographs – not lineups, but photographs of various people in this case. |
| The Court: | And – |
| Nameroff: | I asked if he was shown a photograph. |
| The Court: | This guy. |
| Government: | No, you did not. |
| Nameroff: | I asked him if he was shown a photograph. |
| Government: | No. Are you addressing what you asked me? |
| Nameroff: | No. What I asked him. |
| The Court: | You are being very slippery, Mr. Nameroff. |
| Nameroff: | Don't you think – Wait a second. I am not new on the block. I have been doing this for years. |
| The Court: | Mr. Nameroff, please keep your emotions under control. |

9

| | |
|---|---|
| Nameroff: | You think Judge for one second he wasn't shown a photograph? Let's be realistic. |
| The Court: | Mr. Nameroff, I am asking you to please provide a proffer, a basis of your question, and you told me that Miss Waugh – |
| Nameroff: | Said that persons who were present at that scene were shown photographs. |
| The Court: | And did they make a statement that they did not identify the person? Is that what you say that she said? |
| Nameroff: | No. She didn't say that. |
| The Court: | Then what is the basis of your statement that, "Weren't you shown a photograph and you couldn't identify?" What is the basis of that question? |
| Nameroff: | Because, Your Honor, under these circumstances – |
| The Court: | You are wanting the jury to hear you? |
| Nameroff: | No. No. Under these circumstances do you think for one moment – |
| The Court: | What is the basis? |
| Nameroff: | I have the photograph. I know this procedure. Why wouldn't this witness be shown a photograph and asked to identify? Tell me, Judge, does that make sense? |
| The Court: | Mr. Nameroff, I have been asking you to answer my question. What is the basis for your statement? And the question was, "You were shown that photograph and you did not identify them." What is the basis of that statement? |
| Nameroff: | Because, Your Honor, I have the photograph. I know that this procedure was done in this case and I know that this witness did not identify my client. |
| Government: | Your Honor, I am going to respond to this. Mr. Nameroff inquired whether or not cooperating witnesses were shown photographs, and I said yes, cooperating witnesses. Not law enforcement witnesses who had previously – Don't give a strange look to convey or telegraph to the jury. |

10

| | |
|---|---|
| The Court: | Just speak to me, Miss Waugh. |
| Government: | And I said to him that the witnesses, the cooperating witnesses, were shown images. How is it that that leads to this person being shown any images – |
| The Court: | I am going to sustain the objection. |

Id. at 89-92.

Morley's trial counsel, Roderick Vereen, thereupon stated to the court,

I am not getting into this between what is going on with Mr. Nameroff and what is going on with the government. But I am so concerned about the prejudicial spillover because the Court has sustained a number of objections against Mr. Nameroff. I do not want the jury to get the impression that my client is involved with this. There is no basis for that, and the Court is going to sustain the objection. I am not sure if the government is asking for an instruction because the court already told the jury that if he didn't have a good-faith basis for that then it is improper. And I am reading the jury's expressions on their faces when the Court calls for sidebars, they are looking at each other, they are starting to form an opinion about defense counsel. I don't want for my client to be put in a position where I am going to more for a mistrial because I am starting to feel that way right now because I don't believe that with all that is going on, it doesn't concern my client with regard to the questions being asked and with regard to the objections that are being made, and the Court sustaining those objections that my client is getting a fair trial here. But I am concerned about the prejudicial spillover . . . .

. . . . I would move to sever my client at this point . . . I would ask the Court to grant a mistrial with regard to Mr. Morley and try us separately because I don't like what I am seeing, I don't like what I am hearing, I don't like the expressions that I'm getting from these jurors. And I think it's going to blow up in my client's face and we are not involved in it . . . This has been going on for the past two days now, and the Court is constantly telling them this is improper, you can't do this, and it will affect my case.

11

Id. at 92-93.

The district court admonished Nameroff "to act in a professional manner" and advised him that he was expected "to do what is right for the rest of the trial." Id. at 93-94.[2]  After the court reiterated that it was sustaining the government's objection to Nameroff's question, Vereen informed the court, "Your Honor, I would like the record to reflect that as Mr. Nameroff just walked by me he looked at me and he said, 'You F'ing prick.'  He didn't say 'F'ing.' He used the word." Id. at 94-95.  At that point, the court concluded the side-bar discussion, sent the jury out of the courtroom, and, outside of the presence of the jury, reprimanded Nameroff for what it called his "totally unacceptable conduct."  Id.  Nameroff assured the court that he could "keep [his] emotions in check" and the jury was called back in for the remainder of Valentin's testimony.  Id. at 96, 98.

ICE Special Agent Edwin Perez subsequently testified that Taylor's boat was discovered on 24 January floating alongside a pier in Legion Park, on the west side of Biscayne Bay.  R10 at 96, 98.  One of its lines was loosely tied to a piling and its engine was still in the water, "as though it just arrived."  Id. at 98-99.  ICE

---

[2] The district court explicitly denied Morley's motion to sever on the following day of trial after finding that there was no reason to believe that the jury's ability to make a reliable judgment about guilt or innocence had been compromised by Nameroff's behavior.  R8 at 4-5. The court assured Morley that it would "continue to remind the jury . . . that there are two separate defendants and each one must be considered individually, and that . . . the lawyers are required to make objections and that they [the jury] made a commitment that they would not consider the objections and the Court's rulings on them."  Id. at 5.

12

Special Agent Mark Samples, who assisted in the processing of the boat, testified that a prescription pill bottle bearing the name "Eugene Russell" was found lying on the floor of the boat.  R12 at 13-16.

Finally, the government presented the testimony of Agent Stephen Morgan, an intelligence research specialist with the DEA's Miami Field Division, who analyzed call detail records of cellular phones subscribed to by Cash, King, the Morley twins, and an "Ian White."  Id. at 23-25, 27-28.  According to Saunders, "Ian White" was the alias under which Russell and Taylor had purchased their cell phones.  R10 at 58-59.  Agent Morgan testified that between 6:48 and 10:40 P.M. on 23 January, the phone subscribed to by Morley made and/or received around thirty calls to and/or from the phones subscribed to by Cash, King, "Ian White," and Derrick.  R12 at 38-61.  All except for two of these calls were answered and ranged in duration from seventeen seconds to almost four minutes.  See id. Although all phones were reflecting off of cell towers in the Miami Gardens area, located north of Coconut Grove, in the earlier part of the evening, the call detail records indicated southerly movement beginning at around 8:00 P.M.  Id. at 29, 31, 33, 35, 44-46, 50.  By 8:28 P.M., Morley's phone was reflecting off of cell tower 143, which Agent Morgan testified is located on the Biscayne Bay coast, just northeast of Royal Road, and by 9:00 P.M., the phones subscribed to by Derrick

13

Morley, King, and Cash all were pinging off cell tower 16, located approximately three miles north of Royal Road and also on the coast. Id. at 47, 49, 51-54. The records showed some movement in Morley's location between about 9:00 and 9:45 P.M., however, he remained in the immediate vicinity of the offload site at all times and was in the area of tower 16 at 10:33 and 10:34 P.M., when he attempted to call Cash and King, respectively, and at 10:36 and 10:40 P.M., when he placed calls to a phone subscribed to by "Ian White," which also was pinging off cell tower 16 at the time. Id. at 51-52, 59-61.

At the close of the government's case-in-chief, Morley moved for a judgment of acquittal on all four counts of the indictment. See id. at 113, 145-46. He argued that it was clear Cash had mistakenly identified him as the twin who was at the Royal Road offload site on 23 January. Id. at 146. Moreover, he pointed out, Saunders had testified that it was Derrick who offloaded the marijuana and that he, Saunders, never saw Morley at the offload site that night. Id. at 151. At the close of all of the evidence, Morley renewed his motion for a judgment of acquittal and asked the court to dismiss Cash's testimony. See R13 at 150. The court concluded that Cash's misidentification was not fatal to the government's case and denied the motion accordingly. Id. at 157, 160.

Before excusing the jury to begin its deliberations, the district court advised

14

the jury regarding Cash's misidentification of Morley as the twin who, along with

Cash, King, Robins, and Saunders, offloaded the marijuana from Taylor's boat on

the night in question:

> During the testimony of Delton Edward Cash he identified one of the individuals that assisted him with the offloading of marijuana on January 23, 2007 as defendant Dwighte Morley. I state to you now that it is not the theory of the case of the United States that Dwighte Morley was one of the individuals offloading the marijuana on January 23, 2007. The theory of the case of the United States is that Dwighte Morley was to act as a lookout on January 23, 2007.

R14 at 16.

With respect to evidence presented by the government that Russell fled from

law enforcement, the court instructed the jury:

> You have also heard testimony that after the commission of the crime the Captain of the 24-foot open fisherman fled from law enforcement officers. Intentional flight of a person immediately after a crime has been committed is not of course sufficient in itself to establish a defendant's guilt, but is a fact which if proved may be considered by you in light of all of the evidence in the case in determining guilt or innocence.
> If you find by evidence beyond a reasonable doubt that the Captain of the 24-foot open fisherman was defendant Eugene Russell, then you may consider whether defendant Russell's conduct in this case constituted flight . . . and that is exclusively for you to determine. And if you determine his conduct constituted flight, then you may decide whether or not that flight showed a consciousness of guilt on his part and the significance to be attached to that evidence. These questions are matters exclusively within your province as judges of the facts.
> In your consideration of any evidence of flight, if you should find that there was flight as to this defendant you should consider that

15

there may be reasons for this conduct which are fully consistent with innocence.[3]

Id. at 26-27.

Finally, the court instructed the jury that it was to consider each defendant and the evidence against him separately, and that a finding of guilt as to one defendant on any or all charges "should not affect [its] verdict as to any other offense or any other defendant." Id. at 29.

The jury returned guilty verdicts against Morley and Russell on all counts of the indictment. R1-115, 116. The district court sentenced Morley to a total of forty-one months of imprisonment, to be followed by three years of supervised release, and sentenced Russell to a total of 121 months of imprisonment, to be followed by eight years of supervised release. R1-145, 154. This appeal followed.

## II. DISCUSSION

On appeal, Morley argues that the evidence was insufficient to sustain convictions on any of the counts of the indictment and that the district court abused its discretion in denying his motion to sever his trial from Russell's. Russell argues on appeal that the district court erred in giving the jury a "flight" instruction

---

[3] The district court had stated previously that it was planning on giving the flight instruction because there was testimony that: Russell was the driver of the boat, the boat slowly left the area but sped away after the van crashed with the police vehicle, and the boat was later found as if "someone was not tying it up carefully as most boats are, suggesting a rapid exit." Id. at 4-5.

16

and that his trial counsel was ineffective. We address the arguments of both defendants in turn.

A. Morley

1. *Sufficiency of the Evidence*

Morley argues that the evidence did not support a finding that he "willfully" joined the conspiracies or acted as a lookout during the offloading of the marijuana. He asserts that although both Cash and Saunders testified that it was their understanding that Morley was to act as the lookout, Morley himself never directly told either of them that he was the lookout. He further contends that the cell phone records established at most that he arrived within a two and a half to three mile radius of Royal Road at some point around the time the offloading apparently took place and that there were no eye witnesses who could affirmatively place him at the scene.

"We review the sufficiency of evidence to support a conviction de novo, viewing the evidence in the light most favorable to the government and drawing all reasonable inferences and credibility choices in favor of the jury's verdict." United States v. Taylor, 480 F.3d 1025, 1026 (11th Cir. 2007). In conducting our review, "our task is not to chose between competing interpretations of the evidence," but, rather, to determine only whether a reasonable jury could have found the defendant

17

guilty based on the evidence before it.  United States v. Jordan, 582 F.3d 1239, 1247 (11th Cir. 2009) (per curiam).  Accordingly, "[t]he evidence does not need to exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of guilt, provided that a reasonable trier of fact could find that the evidence established guilt beyond a reasonable doubt."  Id. (quotation marks and citation omitted).

a.      *Counts One and Three – Conspiracy to Import Marijuana; Conspiracy to Possess with Intent to Distribute Marijuana*

To sustain a conviction for conspiracy under 21 U.S.C. §§ 952(a), 963 (conspiracy to import) or 21 U.S.C. §§ 841, 846 (conspiracy to possess with intent to distribute), "the government must demonstrate that an agreement existed between two or more people to commit a crime, that the accused had knowledge of at least the essential objectives of that agreement, and that armed with that knowledge, he voluntarily joined or participated in the illegal venture."  United States v. Battle, 892 F.2d 992, 999 (11th Cir. 1990) (per curiam).  A defendant's knowing participation in a conspiracy may "be inferred from evidence that the defendant took action that furthered the conspiracy."  United States v. Cooper, 873 F.2d 269, 272 (11th Cir. 1989) (per curiam).  "Culpable participation need not be great.  Guilt may exist even when the defendant plays only a minor role and does not know all the details of the conspiracy."  United States v. Lyons, 53 F.3d 1198,

18

1201 (11th Cir. 1995). "Although mere presence is inadequate to establish guilt, . . . it is material, highly probative, and not to be discounted." United States v. Gamboa, 166 F.3d 1327, 1332 (11th Cir. 1999) (quotation marks and citation omitted); see also Lyons, 53 F.3d at 1201 ("Presence . . . raises a permissible inference of participation in the conspiracy.").

Morley does not dispute the existence of the conspiracies, but contends that he did not knowingly participate in them. Morley's argument is without merit. Cash testified at trial that Morley was present when Cash first met with Taylor and Derrick to discuss the offloading plan and that Morley told him "they needed [his] help to go pick up something." Morley's cell phone records also showed that he was in near-constant contact with Cash, King, and Derrick, leading up to and during the offloading operation. This evidence was sufficient to prove that Morley knew about the illegal scheme to import marijuana.

The evidence was likewise sufficient to show that Morley was not merely present at or near the scene of the offloading operation, but acted in furtherance of the conspiracies by serving as the lookout. Cash testified that after Derrick spoke with Taylor and Morley at King's cousin's house, Derrick told Cash that the plan was for Morley to "be on top and be the lookout" when they offloaded the marijuana. Saunders also was told, upon arriving in the boat at the offload site,

19

that Morley was "up top." Cash further testified that after spotting a vehicle in the offload area, he called Morley to make sure Morley was "still on top looking out," and Morley told him "yes, everything looked good, don't worry about nothing." Morley's cell phone records confirm that Morley was present in the immediate vicinity of the offload site and spoke to Cash numerous times during the execution of the illegal importation scheme. Cash's and Saunders' testimonies, which the jury was entitled to credit, were sufficient for a reasonable jury to find that Morley knowingly and voluntarily participated in the conspiracies charged. See United States v. Ndiaye, 434 F.3d 1270, 1296 (11th Cir. 2006).[4]

b.      *Count Two – Importation of Marijuana into the United States*

We have held that where the evidence is sufficient to establish that the defendant, charged with both conspiracy to import and importation, knowingly participated in the conspiracy, the government need not present additional evidence in order to obtain a conviction on the substantive count, "for it charges [him] with an event which occurred while [he] actively participated in the alleged conspiracy." Battle, 892 F.2d at 999. Because the evidence in this case was sufficient to establish that Morley knowingly joined the conspiracy to import marijuana, it is

---

[4]The fact that Cash misidentified Morley at trial and that it was Derrick and not Morley who assisted in the offloading of the marijuana is of no consequence, as the evidence nevertheless established that Morley participated in the entire criminal scheme by serving as the "lookout."

20

likewise sufficient to establish Morley's guilt as to the substantive offense of importation.  See id.; see also United States v. Johnson, 575 F.2d 1347, 1366-67 (5th Cir. 1978) (where there was sufficient evidence to prove defendant was active, knowing participant in conspiracy to import marijuana, no additional evidence was necessary to convict on substantive importation count that "charge[d] [defendant] with an event which occurred while he was active as a member of the conspiracy.").

c.    *Count Four – Possession with Intent to Distribute Marijuana*

To sustain a conviction under 21 U.S.C. § 841(a)(1), the government must prove that the defendant knowingly possessed a controlled substance with the intent to distribute it.  21 U.S.C. § 841(a)(1); United States v. Hernandez, 433 F.3d 1328, 1333 (11th Cir. 2005).   Possession may be actual or constructive, and the "[i]ntent to distribute may be inferred from the amount of the drug involved."  Id. (quotation marks, alteration, and citation omitted).  A defendant who aids or abets others in their possession with intent to distribute a controlled substance may be convicted under § 841(a) as a principal, even if he himself never actually or constructively possessed the controlled substance.  See 18 U.S.C. § 2; Cooper, 873 F.2d at 272-73.  "To prove guilt under a theory of aiding and abetting, the Government must prove: (1) the substantive offense was committed by someone;

21

(2) the defendant committed an act which contributed to and furthered the offense; and (3) the defendant intended to aid in its commission." Hernandez, 433 F.3d at 1333 (quotation marks and citation omitted).

First, there is no question in this case that Morley's co-conspirators possessed the marijuana and, based on the amount of marijuana found in the van, that they intended to distribute it. See id. Second, as we previously discussed, the trial testimony established that Morley knowingly and intentionally furthered the commission of the offense by acting as a lookout while the others offloaded the marijuana from the boat and placed it in King's van. Inasmuch as the evidence was sufficient to show that Morley aided and abetted the others in their possession with intent to distribute the marijuana, it was sufficient to convict Morley as a principal under 21 U.S.C. § 841(a)(1), (b)(1)(B).

*2. Motion to Sever*

Morley argues that the district court should have severed his trial from that of Russell because Nameroff's behavior and the tactics he employed during trial prejudiced his defense. Specifically, Morley notes that (1) the district court had to admonish Nameroff on several occasions; (2) Nameroff asked improper questions about events that never took place; (3) Nameroff called Morley's attorney a "f'ing prick"; (4) Nameroff started crying during closing arguments making some of the

22

jurors laugh; and (5) Nameroff told the jury during opening statements that Russell had an alibi defense but then never presented one.

"[W]e will not reverse the denial of a severance motion absent a clear abuse of discretion resulting in compelling prejudice against which the district court offered no protection." United States v. Ramirez, 426 F.3d 1344, 1352 (11th Cir. 2005) (per curiam) (quotation marks and citation omitted). Compelling prejudice exists if "the jury [i]s unable to sift through the evidence and make an individualized determination as to each defendant." Id. (quotation marks and citation omitted). We presume that a jury follows the instructions given to it by the district court and are "reluctant to reverse a district court's denial of severance, particularly in conspiracy cases, as generally persons who are charged together should also be tried together." Id. (quotation marks and citation omitted).

Morley presents no evidence that the jury failed to follow the district court's instruction that it treat the defendants and the evidence against them on each charge separately and independently. He thus failed to show that Nameroff's defense of Russell had a compelling prejudicial effect on his case. See id. Further, the trial transcript reflects that Nameroff called Morley's attorney a "f-ing prick" outside the presence of the jury. We thus fail to see how this comment, while wholly inappropriate, could have prejudiced Morley's defense. The district court

23

did not abuse its discretion in denying Morley's severance motion.

B.  Russell

1.  *Flight Instruction*

Russell argues that the district court erred in instructing the jury that it could consider his flight from law enforcement as evidence of his guilt because the government failed to show that he was aware at the time of flight that he was being pursued by law enforcement for the crimes charged.

"We review de novo the jury instructions given by the district court to determine whether they misstate the law or mislead the jury to the objecting party's prejudice."  United States v. Gomez, 580 F.3d 1229, 1233 (11th Cir. 2009) (quotation marks and citation omitted).  We have held that "[e]vidence of flight is admissible to demonstrate consciousness of guilt and thereby guilt."  United States v. Blakey, 960 F.2d 996, 1000 (11th Cir. 1992).  Absent a clear abuse of discretion, we will not overturn the district court's ultimate decision as to whether to admit such evidence.  See id. at 1001.

At trial, Valentin testified that after the marijuana was offloaded into the van, Russell began piloting the boat away from the seawall at a slow rate of speed. Almost immediately after the crash occurred, however, Valentin observed the boat speed off and vanish out of sight.  Bleier's testimony that he activated his vehicle's

police lights just prior to the crash also supports a finding that Russell heard the crash and saw the police lights before speeding away. Further, testimony that the boat, which contained a prescription pill bottle belonging to Russell, had been found loosely tied to a pier piling with its engine still in the water suggests that Russell abandoned the boat in a hurried manner, consistent with flight. Because the evidence was sufficient to show that Russell fled the police to avoid arrest for the charged crimes, the district court did not abuse its discretion in giving the flight instruction.

*2. Ineffective Assistance of Counsel*

We do not generally consider on direct appeal a claim of ineffective assistance of counsel that was not first raised before the district court, *unless* the record with regard to the merits of such a claim is sufficiently developed. United States v. Camacho, 40 F.3d 349, 355 (11th Cir. 1994), overruled in part on other grounds by United States v. Sanchez, 269 F.3d 1250 (11th Cir. 2001). The record in this case is not sufficiently developed for us to review Russell's ineffective-assistance-of-counsel claim and we therefore will not consider it. Should Russell wish to assert this claim, the proper vehicle for doing so is a 28 U.S.C. § 2255 motion to vacate. See id.

## III. CONCLUSION

Dwighte Morley and Eugene Russell appeal their convictions for conspiracy to import 100 kilograms or more of marijuana, importation of 100 kilograms or more of marijuana, conspiracy to possess with intent to distribute 100 kilograms or more of marijuana, and possession with intent to distribute 100 kilograms or more of marijuana. For the foregoing reasons, their convictions are AFFIRMED.

**AFFIRMED.**